**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-2084**

STEVE COOKSEY,

                Plaintiff - Appellant,

      v.

MICHELLE FUTRELL; BRENDA BURGIN ROSS; KATHLEEN SODOMA; CHRISTIE NICHOLSON; PHYLLIS HILLIARD; CATHLEEN E. OSTROWSKI; RICHARD W. HOLDEN, SR.,

                Defendants – Appellees.

------------------------------

AMERICAN CIVIL LIBERTIES UNION OF NORTH CAROLINA LEGAL FOUNDATION, INCORPORATED,

                Amicus Supporting Appellant.

**No. 12-2323**

STEVE COOKSEY,

                Plaintiff - Appellant,

      v.

MICHELLE FUTRELL; BRENDA BURGIN ROSS; KATHLEEN SODOMA; CHRISTIE NICHOLSON; PHYLLIS HILLIARD; CATHLEEN E. OSTROWSKI; RICHARD W. HOLDEN, SR.,

                Defendants – Appellees.

------------------------------

AMERICAN CIVIL LIBERTIES UNION OF NORTH CAROLINA LEGAL FOUNDATION, INCORPORATED,

Amicus Supporting Appellant.

_____

Appeals from the United States District Court for the Western District of North Carolina, at Charlotte. Max O. Cogburn, Jr., District Judge. (3:12-cv-00336-MOC-DSC)

_____

Argued: May 15, 2013                              Decided: June 27, 2013

_____

Before Sandra Day O'CONNOR, Associate Justice (Retired), Supreme Court of the United States, sitting by designation, and FLOYD and THACKER, Circuit Judges.

_____

No. 12-2084 dismissed; No. 12-2323 vacated and remanded by published opinion. Judge Thacker wrote the opinion, in which Associate Justice O'Connor and Judge Floyd joined.

_____

**ARGUED:** Jeff Rowes, INSTITUTE FOR JUSTICE, Arlington, Virginia, for Appellant. W. Clark Goodman, WOMBLE CARLYLE SANDRIDGE & RICE, PLLC, Charlotte, North Carolina, for Appellees. **ON BRIEF:** Paul M. Sherman, INSTITUTE FOR JUSTICE, Arlington, Virginia; Robert W. Shaw, WILLIAMS MULLEN, Raleigh, North Carolina, for Appellant. Sean F. Perrin, WOMBLE CARLYLE SANDRIDGE & RICE, LLP, Charlotte, North Carolina; Henry W. Jones, Jr., Lori P. Jones, JORDAN PRICE WALL GRAY JONES & CARLTON, PLLC, Raleigh, North Carolina, for Appellees. Christopher Brook, ACLU OF NORTH CAROLINA LEGAL FOUNDATION, Raleigh, North Carolina, for Amicus Supporting Appellant.

_____

THACKER, Circuit Judge:

Steve Cooksey ("Cooksey" or "Appellant") appeals the district court's dismissal of his complaint filed against Michelle Futrell, Brenda Burgin Ross, Kathleen Sodoma, Christie Nicholson, Phyllis Hilliard, Cathleen Ostrowski, and Richard Holden, members of the North Carolina Board of Dietetics/Nutrition (collectively, the "State Board" or "Appellees"). Cooksey alleges the State Board violated his First Amendment rights by causing him to self-censor certain speech on his website wherein he offered both free and fee-based dietary advice to website visitors. The district court held that Cooksey did not have standing to bring these claims, reasoning that he did not suffer an actual or imminent injury-in-fact.

The district court erred, however, in not analyzing Cooksey's claims under the First Amendment standing framework. As explained below, under that analysis, Cooksey has sufficiently satisfied the First Amendment injury-in-fact requirement by showing that the State Board's actions had an objectively reasonable chilling effect on the advice and commentary he posted on his website. His claims are likewise ripe for adjudication. We thus vacate the district court's order dismissing Cooksey's complaint, and remand so that the district court may consider Cooksey's claims on the merits.

3

I.

A.

On February 15, 2009, Cooksey was rushed to the hospital on the verge of a diabetic coma. He was subsequently diagnosed with Type II diabetes. Licensed dietitians advised that he should eat a diet low in fats and high in carbohydrates. After looking into the matter, however, Cooksey came to the independent conclusion that he should do the inverse, that is, eat a diet high in fat and low in carbohydrates, also called the "Paleolithic diet" because it is similar to the diet of humans living in the Stone Age. According to Cooksey, shortly after adopting this diet, his blood sugar normalized and he was able to stop using insulin and other prescription medications. Cooksey says that this, coupled with exercise, enabled him to lose 78 pounds, and he "feels healthier than ever." J.A. 11 (Compl. ¶ 25).[1]

In January 2010, Cooksey launched a website, now called "Diabetes Warrior," www.diabetes-warrior.net, wherein he talked about his weight loss and lifestyle changes, including his personal meal plans and favorite recipes. The website contained a disclaimer that Cooksey was not a licensed medical

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

professional and did not have any formal medical education or special dietary qualifications. On the website, Cooksey expressed his opinion that the high carbohydrate/low-fat diet was causing more obesity and diabetes. His site ultimately became very popular, with approximately 20,000 unique visitors in December 2011 and January 2012 alone.

The website had three main components of relevance to this appeal: (1) a "Dear Abby-style Advice Column," in which Cooksey selected certain questions he received from visitors to his website and posted them, along with his answers, J.A. 27-28 (Compl. ¶¶ 106-14); (2) a free "Personal Dietary Mentoring" section, in which visitors would post questions or share stories about diet, exercise, and related issues, and Cooksey would respond to the posts, id. at 28-29 (Compl. ¶¶ 115-24); and (3) a fee-based "'Diabetes Support' Life-Coaching" service, in which Cooksey proposed a fee in exchange for providing individualized advice and moral support to those wishing to try the Paleolithic diet,[2] id. at 30-31 (Compl. ¶¶ 125-31).

B.

On January 12, 2012, Cooksey attended a nutritional seminar for diabetics at a church near his home. The seminar

---

[2] For example, for $197/month, Cooksey would have 20 15-minute phone conversations and exchange 8 emails each month with a client.

5

leader -- the director of diabetic services at a local hospital -- expressed her view that a high-carbohydrate, low-fat diet is best for diabetics. During the question-and-answer portion of the seminar, Cooksey expressed his counter opinion that a Paleolithic diet is best for diabetics. Someone present at the seminar reported Cooksey to the State Board, which is charged with administering North Carolina's Dietetics/Nutrition Practice Act (the "Act"), and claimed that Cooksey was engaging in the unlicensed practice of dietetics.

The Act prohibits any unlicensed person from engaging in "the practice of dietetics/nutrition," N.C. Gen. Stat. § 90-365(1), which is defined as "the integration and application of principles derived from the science of nutrition, biochemistry, physiology, food, and management and from behavioral and social sciences to achieve and maintain a healthy status." Id. § 90-352(2). "The primary function of dietetic/nutrition practice is the provision of nutrition care services." Id. "Nutrition care services" include the following:

a. Assessing the nutritional needs of individuals and groups, and determining resources and constraints in the practice setting.
b. Establishing priorities, goals, and objectives that meet nutritional needs and are consistent with available resources and constraints.
c. Providing nutrition counseling in health and disease.
d. Developing, implementing, and managing nutrition care systems.

6

e. Evaluating, making changes in, and maintaining appropriate standards of quality in food and nutrition services.

Id. § 90-352(4).

The Act also provides, "Any person who violates any provision of this Article shall be guilty of a Class 1 misdemeanor. Each act of such unlawful practice shall constitute a distinct and separate offense." N.C. Gen Stat. § 90-366. The Act gives the State Board the power to "make application to any appropriate court for an order enjoining violations of this Article, and upon a showing by the [State] Board that any person has violated or is about to violate this Article, the court may grant an injunction, restraining order, or take other appropriate action." Id. § 90-367; see also id. § 90-356(5) (providing that the State Board shall, inter alia, "[c]onduct investigations, subpoena individuals and records, and do all other things necessary and proper . . . to enforce this Article"). State regulations further provide, "Any person, whether residing in this state or not, who by use of electronic or other medium performs any of the acts described as the practice of dietetics/nutrition, but is not licensed . . . shall be deemed by the [State] Board as being engaged in the practice of dietetics/nutrition and subject to the enforcement provisions available to the Board." 21 N.C. Admin. Code 17.0403 (2006).

Cooksey alleges that shortly after the diabetics seminar, the Executive Director of the State Board, Charla Burill, called him and told him "he and his website were under investigation." J.A. 18 (Compl. ¶ 63). When Cooksey asked if he needed a lawyer, Burill responded that the State Board "tried to resolve complaints informally, but that [it] does have the statutory authority to seek an injunction to prevent the unlicensed practice of dietetics." Id. (Compl. ¶ 64). Apparently during this same conversation, Burill asked Cooksey to move the disclaimer stating that he is a layperson to the home page of the website, and he did so without objection. She also "instructed" Cooksey "to take down the part of his website where he offered his 'Diabetes Support' life-coaching service because such a service constitutes the unlicensed practice of dietetics." Id. (Compl. ¶ 65-66). Cooksey reluctantly complied with this request "because he feared civil and criminal action against him . . . ." Id. (Compl. ¶ 65). Burill then told Cooksey that the Complaint Committee of the State Board "would review his website and report back to him on what he may and may not say without a dietitian's license." Id. (Compl. ¶ 67).

On January 27, 2012, Burill emailed Cooksey, stating,

> I have reviewed your website with the Complaint Committee. Please find attached a document containing pages from your website with areas of concern noted. Given our discussion, I believe our comments should make sense, however, should you disagree, I am happy

8

to discuss.  Please feel free to contact me with any questions you may have.  Should you agree with our comments, <u>we would ask that you make any necessary changes to your site, and moreover, going forward, align your practices with the guidance provided.</u>  Again, please contact me with any questions, and please update me as changes are made.

<u>Id.</u> at 66 (emphasis supplied).  Burill attached print-outs from Cooksey's website, which she and the Complaint Committee had marked with a red pen, indicating which statements showed "areas of concern."  <u>Id.</u>; <u>see also</u> <u>id.</u> at 35-53 (the "red-pen review").

Some of the comments from the red-pen review include the following:

- "You should not be addressing diabetic's specific questions.  You are no longer just providing information when you do this, you are assessing and counseling, both of which require a license." J.A. 39.

- "When helping [a website visitor] with this issue [introducing whipping cream into her diet] you were assessing and advising -- these activities require a license.  Further -- would seem to communicate to the public that you can provide this type of service possibly for them too when you post in this manner." <u>Id.</u> at 40.

- "It is acceptable to provide just this information [a meal plan], but when you start recommending it directly to people you speak to or who write you, you are now providing diabetic counseling, which requires a license."  <u>Id.</u> at 45.

- "(1) As previously stated, you can provide information on your site, but you cannot work one-on-one with individuals[.] (2) Consider how these testimonials come across to the public -- would the lay person believe you could counsel him/her?" <u>Id.</u> at 48.

9

The State Board simply drew large red "X's" through Cooksey's various fee-based life-coaching packages.

Cooksey did not contact the State Board to further discuss the red-pen review as Burill's email invited; rather, he altered his website and "ceased expressing opinions in the form of personal dietary advice based on his fear of civil and criminal action against him by the State of North Carolina." J.A. 25 (Compl. ¶ 101). On April 9, 2012, Burill sent Cooksey a letter on State Board letterhead stating, in relevant part,

> Under North Carolina General Statute § 90-365, a license is required to engage in the practice of dietetics/nutrition. Upon initial review of your website it was discovered that you were advertising "diabetes support packages" and charging a fee for these services. When we spoke on January 18, 2012[3] you indicated that you would take down the support packages page and make the disclaimer on your website more prominent. Shortly thereafter, although you did not take down the page, you did delete the packages and you did make your disclaimer more prominent.
>
> Since our last correspondence, it appears that you have remained in substantial compliance with the requirements of Article 25, Chapter 90 of the North Carolina General Statutes. Therefore, effective April 9, 2012, the Board is closing this complaint. <u>As with all complaints, the Board reserves the right to continue to monitor this situation</u>.

Id. at 105 (emphasis supplied).

_____

[3] It appears that Burill is referring to an email communication she had with Cooksey on January 18, 2012, wherein Cooksey told her he had moved his disclaimer to the home page and removed the diabetes support packages page. See J.A. 66.

On May 29, 2012, Cooksey filed suit in the Western District of North Carolina, alleging Appellees violated his First Amendment rights. Specifically, the complaint contains three counts alleging violations of 42 U.S.C. § 1983:

(1) Count One: a violation based on restriction of the "Dear Abby-style Advice Column": the application of the Act "is a content-based restriction on his speech in that the State Board declared his speech illegal based on the fact that it involved advice about diet and not advice about any other topic such as auto mechanics, taking the SATs, or marriage";

(2) Count Two: a violation based on the restriction of the free "Personal Dietary Mentoring" that Cooksey offered through his website: "Defendants' prohibition of Plaintiff Cooksey's personal, ongoing, uncompensated mentorship . . . is an unconstitutional prohibition on something that Americans have done since the inception of the United States: share advice among friends"; and

(3) Count Three: a violation based on the restriction of Cooksey's fee-based "'Diabetes Support' Life-Coaching" packages: "The speech associated with Plaintiff Cooksey's personal, ongoing, uncompensated mentorship of friends, acquaintances, readers, or family, as described in this Complaint, which Plaintiff Cooksey contends is speech protected by the First Amendment, does not lose its First Amendment protection simply because Plaintiff Cooksey charges a fee for that exact same speech."

J.A. 27-30 (Compl. ¶¶ 106-31). Cooksey seeks a declaratory judgment that the Act and attendant regulations "are unconstitutional as-applied and on their face to the extent that they prohibit Plaintiff Cooksey from" conducting the Dear-Abby-style column, personal dietary mentoring, and the life-coaching

service; a permanent injunction preventing the State Board from enforcing the Act and attendant regulations; and attorney's fees and costs. Id. at 31-32 (Compl. ¶¶ A-H).

On July 27, 2012, Appellees filed a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) for lack of standing and ripeness, and 12(b)(6) for failure to state a First Amendment claim. The motion was referred to a magistrate judge, who recommended that the motion be granted and the complaint be dismissed for lack of standing. The district court agreed and dismissed the complaint without prejudice on October 5, 2012, explaining,

> Plaintiff's first objection is that it was plain error for the magistrate judge to conclude that because the state board issued no formal decision, there could be no injury. As the undersigned recognized in its own Order and as found by the magistrate judge in the M&R, plaintiff volunteered to remove parts of his website that the state board's executive director identified as being areas of concern. The record before the court is devoid of any evidence or even an allegation that the state board made a formal determination on whether plaintiff violated the Dietetics/Nutrition Practice Act, N.C. Gen. Stat. § 90-350, et seq., took or threatened any formal action in response to the complaint lodged against plaintiff, or ordered compliance in any way. Indeed, there is no evidence or allegation that the state board or its executive director referred the complaint to a district attorney for prosecution. See N.C. Gen. Stat. § 90-366.
>
> Inasmuch as plaintiff was not subjected to any actual or imminent enforcement of the Act, he lacks Article III standing. . . . Clearly, voluntarily removing parts of one's website in response to an inquiry from a state licensing board is not a sufficient injury to invoke Article III standing.

12

<u>Cooksey v. Futrell</u>, No. 3:12-cv-336, 2012 WL 4756065, at *2-3 (W.D.N.C. Oct. 5, 2012) (J.A. 128-30).  Cooksey timely noted this appeal.[4]

## II.

We review de novo a district court's dismissal for lack of subject matter jurisdiction.  <u>See</u> <u>Taylor v. Kellogg Brown & Root Servs., Inc.</u>, 658 F.3d 402, 408 (4th Cir. 2011).  We also review de novo a district court's dismissal for lack of standing and ripeness.  <u>Frank Krasner Enters. v. Montgomery Cnty.</u>, 401 F.3d 230, 234 (4th Cir. 2005); <u>Miller v. Brown</u>, 462 F.3d 312, 316 (4th Cir. 2006).  The burden of establishing standing falls on the party claiming subject-matter jurisdiction.  <u>Frank Krasner Enters.</u>, 401 F.3d at 234.

In reviewing the dismissal of a complaint, we must "assume all well-pled facts to be true" and "draw all reasonable inferences in favor of the plaintiff."  <u>Nemet Chevrolet Ltd. v. Consumeraffairs.com, Inc.</u>, 591 F.3d 250, 253 (4th Cir. 2009)

---

[4] Cooksey also filed a motion for preliminary injunction to enjoin enforcement of the Act during the pendency of his case, which the district court denied.  <u>See</u> <u>Cooksey v. Futrell</u>, No. 3:12-cv-336, 2012 WL 3257811 (W.D.N.C. Aug. 8, 2012).  Cooksey appealed the district court's order denying his motion on September 5, 2012, <u>see</u> <u>Cooksey v. Futrell</u>, No. 12-2084 (4th Cir. Sept. 5, 2012), but he has now abandoned that appeal.  <u>See</u> Appellant's Br. 1, 3.  For that reason, we dismiss appeal no. 12-2084.

(internal quotation marks and alterations omitted). In addition, "[w]hen addressing the appropriateness of dismissal for lack of standing, we consider exhibits attached to the complaint in addition to the complaint itself." S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC, 713 F.3d 175, 182 (4th Cir. 2013). We must also consider "documents incorporated into the complaint by reference." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).

### III.

This appeal concerns "the threshold issue of justiciability." Dep't of Commerce v. U.S. House of Representatives, 525 U.S. 316, 328 (1999). Appellees contend Cooksey's claims are not justiciable because he does not have standing to bring them, and furthermore, they are not ripe. For the reasons that follow, Cooksey's claims are justiciable because he has sufficiently shown that he suffered an injury-in-fact by First Amendment standards, and likewise, the claims are ripe for adjudication.

### A.

### Standing

In determining whether Cooksey's claims are justiciable, we first turn to standing. Article III of the United States Constitution "gives federal courts jurisdiction only over cases and controversies, and the doctrine of standing

14

identifies disputes appropriate for judicial resolution." Miller v. Brown, 462 F.3d 312, 316 (4th Cir. 2006) (internal quotation marks and citations omitted). The standing doctrine is "an integral component of the case or controversy requirement," id., and has three elements:

> First, the plaintiff must have suffered an injury in fact -- an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of -- the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (internal quotation marks, citations, and alterations omitted).

The Supreme Court of the United States has explained that standing requirements are somewhat relaxed in First Amendment cases:

> Even where a First Amendment challenge could be brought by one actually engaged in protected activity, there is a possibility that, rather than risk punishment for his conduct in challenging the statute, he will refrain from engaging further in the protected activity. Society as a whole then would be the loser. Thus, when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged.

Secretary of State of Md. v. Joseph H. Munson Co., Inc., 467 U.S. 947, 956 (1984); see also Human Life of Wash. Inc. v.

15

Brumsickle, 624 F.3d 990, 1000 (9th Cir. 2010) ("[W]hen a challenged statute risks chilling the exercise of First Amendment rights, the Supreme Court has dispensed with rigid standing requirements[.]" (internal quotation marks and citation omitted)); Lopez v. Candaele, 630 F.3d 775, 781 (9th Cir. 2010) ("First Amendment cases raise unique standing considerations that tilt dramatically toward a finding of standing." (internal quotation marks and citations omitted)). The leniency of First Amendment standing manifests itself most commonly in the doctrine's first element: injury-in-fact.

Injury-in-fact is defined as "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560 (internal quotation marks and citations omitted). Appellees contend that Cooksey loses on this first element because "rather than alleging an injury in fact, [he] alleges only a hypothetical 'injury' based on what the [State] Board might do in the future." Appellees' Br. 20. Further, Appellees maintain, "the [State] Board never compelled Mr. Cooksey to refrain from doing anything, and there was neither actual nor imminent enforcement of the Act." Id. at 21. Cooksey, however, claims he "plainly suffered an injury-in-fact when he self-censored in response to the threat of sanctions under the Dietetics Practice Act and in response to the actions

16

of the State Board." Appellant's Br. 30. He also maintains "his speech was chilled by the civil and criminal sanctions enumerated in the Dietetics Practice Act as well as by the specific actions of the State Board." Id. at 31. We agree with Cooksey.

1.

In the most general sense, the plaintiff must have suffered an injury or threat of injury that is "credible," not "imaginary or speculative." Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979). In First Amendment cases, the injury-in-fact element is commonly satisfied by a sufficient showing of "self-censorship, which occurs when a claimant is chilled from exercising h[is] right to free expression." Benham v. City of Charlotte, 635 F.3d 129, 135 (4th Cir. 2011) (internal quotation marks omitted). This court has explained,

> We have recognized that, to demonstrate injury in fact, it is sufficient to show that one's First Amendment activities have been chilled. Subjective or speculative accounts of such a chilling effect, however, are not sufficient. Any chilling effect must be objectively reasonable. Nevertheless, a claimant need not show [he] ceased those activities altogether to demonstrate an injury in fact. Government action will be sufficiently chilling when it is likely to deter a person of ordinary firmness from the exercise of First Amendment rights.

Id. (internal quotation marks, citations, and alterations omitted).

17

We are mindful, however, that the chilling effect cannot "arise merely from the individual's knowledge that a governmental agency was engaged in certain activities or from the individual's concomitant fear that, armed with the fruit of those activities, the agency might in the future take some other and additional action detrimental to that individual." Laird v. Tatum, 408 U.S. 1, 11 (1972). In other words, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm[.]" Id. at 13-14. But see Mangual v. Rotger-Sabat, 317 F.3d 45, 56 (1st Cir. 2003) (recognizing a First Amendment injury-in-fact when a plaintiff is "chilled from exercising h[is] right to free expression or forgoes expression in order to avoid enforcement consequences") (internal quotation marks omitted)).

a.

In his complaint and its attached exhibits, Cooksey has sufficiently shown that he has experienced a non-speculative and objectively reasonable chilling effect of his speech due to the actions of the State Board. The complaint states, "But for the State Board's red-pen review of his website, conversations and emails with officials of the [State Board], . . . Cooksey would not have a speech-chilling uncertainty about the legality of private conversations and correspondence . . . in which he

18

expresses opinions in the form of personal dietary advice" and he "would resume his Dear Abby-style advice column[.]" J.A. 26 (Compl. ¶ 103-04). Most telling is the fact that Cooksey actually "ceased expressing opinions in the form of personal dietary advice," id. at 25, on the mentoring and Dear-Abby-style sections of the website. He did not even have to go that far for an injury-in-fact to lie. See Benham, 635 F.3d at 135 ("[A] claimant need not show [he] ceased those activities altogether to demonstrate an injury in fact." (internal quotation marks omitted)).

Further, the State Board's actions would be "likely to deter a person of ordinary firmness from the exercise of First Amendment rights." Benham, 635 F.3d at 135 (internal quotation marks and alteration omitted). Cooksey received a telephone call from the highest executive official of a state agency, who told him she had the "statutory authority" to seek an injunction against him if he did not bring his website in line with the Act's proscriptions. J.A. 18 (Compl. ¶ 64). He received a red-pen mark-up of his website from the State Board Complaint Committee, which surely triggered the same trepidation we have all experienced upon receiving such markings on a high school term paper. Furthermore, the red-pen review was accompanied by the statement, "we would ask that you make any necessary changes to your site, and moreover, going forward, align your practices

19

with the guidance provided." Id. at 66. And Cooksey was told, in effect, that he would remain under the watchful eye of the State Board in a letter signed by Burill, which stated, "As with all complaints, the Board reserves the right to continue to monitor this situation." Id. at 105. A person of ordinary firmness would surely feel a chilling effect -- as Cooksey did.

In fact, this case presents more persuasive evidence of chilling than another case from this court in which standing was achieved. In North Carolina Right to Life, Inc. v. Bartlett ("NCRL"), this court found that NCRL, a non-profit group with the purpose of "protect[ing] human life," had standing to challenge certain state election regulations that would impose criminal penalties on organizations making contributions for a "political purpose." 168 F.3d 705, 708, 709 (4th Cir. 1999). NCRL wrote to the State Board of Elections to inquire whether some of its activities (specifically, distributing voter guides) would violate the regulations at issue, and the Board answered in the affirmative. See id. at 709. "As a result," the court held, "NCRL refrained from disseminating its guide, and its speech was chilled." Id. at 710. The court stated, "this case presents a statute aimed directly at plaintiffs who 'will have to take significant . . . compliance measures or risk criminal prosecution[.]'" 168 F.3d at 711 (quoting Virginia v. Am. Booksellers Ass'n, 484 U.S. 383, 392 (1988)).

20

In the present case, we not only have evidence of specific and -- unlike NCRL -- unsolicited written and oral correspondence from the State Board explaining that Cooksey's speech violates the Act, but we also have a plaintiff who stopped engaging in speech because of such correspondence, and an explicit warning from the State Board that it will continue to monitor the plaintiff's speech in the future. See J.A. 18 (Compl. ¶ 63-64) (Burill told Cooksey "that he and his website were under investigation" and that the State Board "does have the statutory authority to seek an injunction to prevent the unlicensed practice of dietetics."); id. at 39 (red-pen review) ("You should not be addressing diabetic's specific questions. You are no longer just providing information when you do this, you are assessing and counseling, both of which require a license."); id. at 66 (Burill email) ("[W]e would ask that you make any necessary changes to your site, and moreover, going forward, align your practices with the guidance provided."); id. at 105 (Burill letter) ("[T]he Board reserves the right to continue to monitor this situation."). Therefore, we have no trouble deciding that Cooksey's speech was sufficiently chilled by the actions of the State Board to show a First Amendment injury-in-fact.

21

b.

Per <u>NCRL</u>, Cooksey also satisfies the injury-in-fact requirement by showing a credible threat of prosecution under the Act. This court explained,

> When a plaintiff faces a credible threat of prosecution under a criminal statute he has standing to mount a pre-enforcement challenge to that statute. <u>A non-moribund statute that facially restricts expressive activity by the class to which the plaintiff belongs presents such a credible threat,</u> and a case or controversy thus exists in the absence of compelling evidence to the contrary. This presumption is particularly appropriate when the presence of the statute tends to chill the exercise of First Amendment rights.

<u>NCRL</u>, 168 F.3d at 710 (internal quotation marks, citations, and alterations omitted) (emphasis supplied).

Cooksey does not have a dietician license; therefore, he belongs to the class implicated by the Act. See <u>NCRL</u>, 168 F.3d at 710. It has never been alleged that the Act is moribund (as evidenced by the fact that Burill told Cooksey that the State Board could seek an injunction pursuant to the Act). See <u>id.</u> Therefore, we are left with the question of whether the Act facially restricts Cooksey's expressive activity.

The Act makes it a Class 1 misdemeanor for people without a dietitian license to, inter alia, "[p]rovide[] nutrition counseling in health and disease," "[e]stablish[] priorities, goals, and objectives that meet nutrition needs . . . ," and "[a]ssess the nutritional needs of individuals and

22

groups, . . . ." N.C. Gen. Stat. §§ 90-352(4), 90-366. Cooksey's complaint describes speech that could fall under each of these categories. See J.A. 14 (Compl. ¶ 42) (alleging Cooksey answered questions on his website "express[ing] his opinion[s]" on dietary issues); id. at 15 (Compl. ¶ 44) (alleging Cooksey "provided links to his personal meal plan and previous posts on food"); id. (Compl. ¶ 46) (alleging Cooksey "recommended that [a] questioner's friend eat as Plaintiff Cooksey does and exercise as much as the friend can"). Therefore, his speech subjects him to a "credible threat" of the criminal penalties set forth in the Act. NCRL, 168 F.3d at 710.[5]

For these reasons, Cooksey has sufficiently proven injury-in-fact, and the district court's conclusion to the contrary was error.

---

[5] The threatened governmental action need not even be a criminal prosecution. See Meese v. Keene, 481 U.S. 465, 473-75 (1987) (plaintiff senator had standing to challenge the government's labeling as "political propaganda" certain films he wished to show, because this label caused the plaintiff to "risk of injury to his reputation"); Initiative and Referendum Inst. v. Walker, 450 F.3d 1082, 1086, 1107 (10th Cir. 2006) (finding that plaintiffs -- wildlife and animal advocacy groups -- had standing where they faced a "credible threat of real consequences" from enforcement of a constitutional requirement that legislation "initiated to allow, limit or prohibit the taking of wildlife" be passed by a supermajority (internal quotation marks omitted)).

23

Once Cooksey clears the initial hurdle of injury-in-fact, he easily satisfies the other two elements of the standing inquiry, causation and redressibility. First, causation is satisfied where "a causal connection between the injury and the conduct complained of that is 'fairly traceable,' and not 'the result of the independent action of some third party not before the court.'" Frank Krasner Enters., 401 F.3d at 234 (quoting Lujan at 560-61) (emphasis removed). Second, the redressibility requirement is satisfied where there is "a non-speculative likelihood that the injury would be redressed by a favorable judicial decision." Id.

The injuries in this case -- a chilling of speech and threat of prosecution -- were caused directly by the actions of the State Board. Cooksey's complaint -- which we must accept as true -- alleges that Burill, Executive Director of the State Board, "instructed" him to "take down the part of his website" that presented the diabetes-support life-coaching packages. J.A. 18 (Compl. ¶64). And there is no dispute that Burill asked Cooksey to "align [his] practices with" the comments set forth in the red-pen review. Id. at 66. As a result, Cooksey removed certain speech from his website and refrained from offering the life-coaching packages and engaging in further individualized advising through his site. A favorable decision on Cooksey's

24

behalf would mean the State Board would be enjoined from enforcing the Act and/or the Act would be deemed unconstitutional. In that case, Cooksey would find full redress, as the advice and mentoring in which he engaged through his website would be restored without fear of penalty.

2.

Appellees contend that the First Amendment standing principles do not apply here because the Act "is a professional regulation that does not abridge the freedom of speech protected under the First Amendment." Appellees' Br. 26. Thus, Appellees claim, "this case is not actually about an infringement of Mr. Cooksey's rights under the First Amendment. It is instead about North Carolina's authority to license occupations to safeguard the public health and safety," and the First Amendment "chilling doctrine" (i.e., the more lenient standing analysis) does not apply. Id. The doctrine to which Appellees refer has come to be called the "professional speech doctrine." Moore-King v. Cnty. of Chesterfield, 708 F.3d 560, 568 (4th Cir. 2013).

But Appellees "put the merits cart before the standing horse." Initiative and Referendum Inst. v. Walker, 450 F.3d 1082, 1093 (10th Cir. 2006). In arguing that Cooksey's claims are not justiciable, Appellees first look to the merits of his First Amendment claims and contend that the professional speech doctrine precludes them. In so doing, they rely on cases that

were decided on the merits and did not address a justiciability challenge. See, e.g., Thomas v. Collins, 323 U.S. 516 (1945) (Jackson, J., concurring); Moore-King, 708 F.3d 560; Accountants' Soc'y of Va. v. Bowman, 860 F.2d 602 (4th Cir. 1988).

The Supreme Court has explained, "whether the statute in fact constitutes an abridgement of the plaintiff's freedom of speech is, of course, irrelevant to the standing analysis." Meese v. Keene, 481 U.S. 465, 473 (1987) (internal quotation marks omitted). Other courts have recognized the same. For example, in Walker, the Tenth Circuit rejected an argument similar to Appellees' argument that "Plaintiffs have not alleged the invasion of a 'legally protected interest,' which they say is necessary to have standing to sue." 450 F.3d at 1092. The Walker court conceded, "a plaintiff whose claimed legal right is so preposterous as to be legally frivolous may lack standing on the ground that the right is not 'legally protected,'" but continued, "where the plaintiff presents a non-frivolous legal challenge, alleging an injury to a protected right such as free speech, the federal courts may not dismiss for lack of standing on the theory that the underlying interest is not legally protected." Id. at 1093. Thus, "[f]or purposes of standing, we must assume the Plaintiffs' claim has legal validity." Id.; see also City of Waukesha v. EPA, 320 F.3d 228, 235 (D.C. Cir. 2003)

26

("[I]n reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims.").

Therefore, the professional speech doctrine does not pull the rug from underneath Cooksey at this early stage of the litigation.  Whether the professional speech doctrine -- as this court has defined it in Bowman and Moore-King -- precludes Cooksey's challenges to the Act and the State Board's actions is a merits determination that may readily be addressed upon remand.

B.

Ripeness

In determining justiciability, we must also address whether Cooksey's claims are ripe.  See Allen v. Wright, 468 U.S. 737, 750 (1984) (identifying ripeness, along with standing, mootness, and political question, as "doctrines that cluster about Article III" (internal quotation marks omitted)). Ripeness "concerns the 'appropriate timing of judicial intervention.'" Va. Soc'y for Human Life, Inc. v. FEC, 263 F.3d 379, 389 (4th Cir. 2001) (quoting Renne v. Geary, 501 U.S. 312, 320 (1991)), overruled on other grounds, Real Truth About Abortion, Inc. v. FEC, 681 F.3d 544, 550 n.2 (4th Cir. 2012). Traditionally, we consider "(1) the fitness of the issues for

27

judicial decision and (2) the hardship to the parties of withholding court consideration." Nat'l Park Hospitality Ass'n v. Dep't of Interior, 538 U.S. 803, 808 (2003).

Our ripeness inquiry, however, is inextricably linked to our standing inquiry. See Doe v. Duling, 782 F.2d 1202, 1206 n.2 (4th Cir. 1986) ("Plaintiff's personal stake in the outcome (standing) is directly limited by the maturity of the harm (ripeness). In any event, both doctrines require that those seeking a court's intervention face some actual or threatened injury to establish a case or controversy.").

Much like standing, ripeness requirements are also relaxed in First Amendment cases. See New Mexicans for Bill Richardson v. Gonzales, 64 F.3d 1495, 1500 (10th Cir. 1995) ("The primary reasons for relaxing the ripeness analysis in th[e] [First Amendment] context is the chilling effect that potentially unconstitutional burdens on free speech may occasion[.]"). Indeed, "First Amendment rights . . . are particularly apt to be found ripe for immediate protection, because of the fear of irretrievable loss. In a wide variety of settings, courts have found First Amendment claims ripe, often commenting directly on the special need to protect against any inhibiting chill." Id. (internal quotation marks omitted).

That standing and ripeness should be viewed through the same lens is evident from Appellees' arguments on this

point. Just as they argued Cooksey has not been injured for standing purposes, they also contend Cooksey's claims are not ripe because the State Board has taken no action against Cooksey and has not "specifically determine[d] the point at which internet communications such as Mr. Cooksey's constitute the practice of dietetics/nutrition requiring a license under the Act[.]" Appellees' Br. 44.

We disagree. This court stated in <u>Virginia Society for Human Life</u>,

> VSHL will face a significant impediment if we delay consideration of the regulation's constitutionality. The presence of the regulation requires VSHL "to adjust its conduct immediately." <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 891 (1990) (noting that these types of "substantive rules" are "'ripe' for review at once"). . . . Our decision today is not an abstract interpretation, but a clarification of the conduct that VSHL can engage in without the threat of penalty. Therefore, we hold that the controversy is ripe for review.

263 F.3d at 390 (some internal quotation marks, citations, and alterations omitted); <u>see also</u> <u>Abbott Labs. v. Gardner</u>, 387 U.S. 136, 153 (1967) ("Where the legal issue presented is fit for judicial resolution, and where a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, access to the courts . . . must be permitted[.]"), <u>abrogated on other grounds</u>, <u>Califano v. Sanders</u>, 430 U.S. 99, 105 (1977).

29

In the same way, Cooksey's claims present the question of whether the Act and actions of the State Board unconstitutionally infringe on Cooksey's rights to maintain certain aspects of his website.  No further action from the Board is needed: it has already, through its executive director, manifested its views that the Act applies to Cooksey's website, and that he was required to change it in accordance with the red-pen review or face penalties.

Appellees rely on language in the State Board email and letter suggesting that more discourse could occur, or that the State Board had not yet made its final decision on this issue.  See, e.g., J.A. 66 ("Should you agree with our comments, we would ask that you make any necessary changes to your site . . . "; "[S]hould you disagree I am happy to discuss.").  None of the State Board's statements, however, indicate that Cooksey is free from the "threat of penalty."  Va. Soc'y for Human Life, 263 F.3d at 390.  To the contrary, the last communication from the State Board to Cooksey specifically stated otherwise.  See J.A. 105 ("As with all complaints, the Board reserves the right to continue to monitor this situation.").  Cooksey desires "a clarification of the conduct that [he] can engage in without" such a threat.  Va. Soc'y for Human Life, 263 F.3d at 390. Therefore, his claims are also ripe.

IV.

For the foregoing reasons, the district court's order dismissing Cooksey's complaint is vacated, and this case is remanded for consideration on the merits. Cooksey's appeal of the district court's denial of his motion for preliminary injunction, which he is no longer pursuing, is dismissed.

No. 12-2084 <u>DISMISSED</u>
No. 12-2323 <u>VACATED AND REMANDED</u>