**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-1976**

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES; AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES LOCAL 2578,

      Plaintiffs – Appellants,

v.

OFFICE OF SPECIAL COUNSEL,

      Defendant – Appellee.

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Paula Xinis, District Judge. (8:19-cv-02322-PX)

Argued: May 5, 2021                     Decided: June 11, 2021

Before WILKINSON and RUSHING, Circuit Judges, and TRAXLER, Senior Circuit Judge.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Rushing and Senior Judge Traxler joined.

**ARGUED:** Kyle David Lyons-Burke, ARNOLD & PORTER KAYE SCHOLER LLP, Washington, D.C., for Appellants. Jack E. Starcher, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Austin R. Evers, Melanie Sloan, John E. Bies, AMERICAN OVERSIGHT, Washington, D.C.; R. Stanton Jones, Daniel F. Jacobson, Jacob Zionce, ARNOLD & PORTER KAYE SCHOLER LLP, Washington, D.C., for Appellants. Jeffrey Bossert Clark, Acting Assistant Attorney

General, Michael S. Raab, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Robert K. Hur, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland; Susan K. Ullman, General Counsel, UNITED STATES OFFICE OF SPECIAL COUNSEL, Washington, D.C., for Appellee.

———————————

WILKINSON, Circuit Judge:

The federal courts are courts of limited jurisdiction. No matter how interesting or elegant a party's argument, the federal courts have no power to breathe life into disputes that come to us without it. The American Federation of Government Employees and the American Federation of Government Employees Local 2578 (jointly "AFGE") claim that we must enjoin the enforcement of an agency's advisory opinion, already since withdrawn, even before we have the slightest indication that any enforcement action has, or will ever, occur. The First Amendment rights of federal employees, they insist, hang in the balance. But this court has no authority to write an advisory opinion on an advisory opinion. Because AFGE's case is now moot, and would otherwise be unripe, we affirm the judgment of the district court.

I.

AFGE represents over 600,000 federal civilian employees. J.A. 98. It challenges two advisory opinions issued by the Office of Special Counsel ("OSC"), the agency tasked by Congress to advise on the way in which the Hatch Act's prohibitions in the federal workplace applied. The original advisory opinion was promulgated on November 27, 2018, and a clarifying opinion was promulgated three days later (jointly, "the Advisory Opinions"). Both opinions bore on conduct related to President Trump's reelection campaign.

The Advisory Opinions first provided guidance on the debate around President Trump's initial impeachment. They indicated that, while OSC considered "express[ing] an opinion" on impeachment entirely proper, it did read the Hatch Act as prohibiting

3

"advocacy for or against" impeachment. J.A. 49. Second, OSC opined on the use of phrases like "resistance" and "#resist," stating that, due to their prominence in partisan political campaigns, it considered their use "in isolation" political activity, though not where "facts and circumstances indicate[d] otherwise." J.A. 46.

AFGE sued OSC, seeking: a declaration that the Advisory Opinions violated its members' rights under the First Amendment; an injunction against OSC's reliance on and enforcement of the Advisory Opinions; and a court order commanding their rescission. In furtherance of its suit, AFGE produced two affidavits, one of which alleged that a member desired to "express" an "opinion while at work on whether the President should be impeached." J.A. 51. The other alleged that a second member desired to "use 'resist,' 'resistance,' and iterations of those terms while at work to express . . . views and opinions on topics of public importance." J.A. 53. Both claimed to have refrained from doing so "to avoid any possibility of being investigated or subject to disciplinary action." J.A. 51, 53.

The district court dismissed AFGE's complaint on ripeness grounds. Drawing on the D.C. Circuit's analysis in *American Federation of Government Employees, AFL-CIO v. O'Connor*, 747 F.2d 748 (D.C. Cir. 1984), the district court observed that the Advisory Opinions were non-binding on the Merit Systems Protection Board (the "MSPB"), that they were promulgated to mitigate the Hatch Act's potential to chill political speech, and that AFGE's allegations were too general to make the case fit for judicial review. J.A. 145–46. It specified that AFGE had not "provided any specific allegation as to how the Advisory Opinion interferes with their First Amendment rights" or even as to how any

4

actual conduct of its members was inconsistent with the Advisory Opinions. J.A. 146–47. Nor did AFGE establish, in the district court's estimation, that dismissal of the complaint would cause any "real hardship" to AFGE or its members. J.A. 149. On the contrary, the district court stated, finding AFGE's case justiciable would impose significant burdens on OSC by forcing it to spend its scarce resources in litigation rather than in performing its characteristic Hatch Act functions. J.A. 148–49. Subsequent to the district court's ruling, President Trump left office and OSC withdrew the challenged guidance.

## II.

We have before us what is in many ways a unique and distinctive statutory scheme. Understanding exactly what AFGE is asking of this court requires a review of the relevant history. The statutory regime presently governing the political activity of federal employees did not, after all, spring up from a seed planted yesterday, or even thirty years ago. Rather, it is the product of close congressional attention since the early days of our republic. In 1791, Congress deliberated on a bill "to prevent Inspectors [of distilled spirits], or any officers under them, from interfering, either directly or indirectly, in elections, further than giving their own votes." 2 Annals of Congress 1924–25 (1791). Although that bill did not pass, the ideal of a neutral civil service had already germinated and was destined to endure. Ten years later, President Jefferson renewed the call and decried "officers of the General Government taking on various occasions active parts in the elections of public functionaries." 10 James D. Richardson, A Compilation of the Messages and Papers of the Presidents, 1789–1879, at 98 (1902). He called instead for a system in which the duty of federal officers to the Constitution would assume precedence

5

over partisan desires to "influence the votes of others []or take . . . part in the business of electioneering." *Id.*

Although not achieved during Jefferson's lifetime, civil service reform was eventually enacted in the Pendleton Act of 1883.  Civil Service Act of 1883, ch. 522, 22 Stat. 403.  The Act represented Congress' judgment that the common good of the nation required some limits on the speech of certain federal employees to safeguard efficiency and integrity in the civil service.  By prohibiting federal employees in certain agencies from "using [their] official authority or influence either to coerce the political action of any person or body or to interfere with any election," the Pendleton Act uprooted the notorious "spoils system" that had hitherto privileged partisan loyalty above professional merit.  *Id.* President Theodore Roosevelt reinforced this regime by executive order, so that federal employees covered by the Pendleton Act "while retaining the right . . . to express privately their opinions on all political subjects, shall take no active part in political management or political campaigns."  Exec. Order No. 642 (June 3, 1907).

However, as the nation became better aware of conditions in the civil service— mainly in consequence of corruption scandals surrounding elections in 1936 and 1938— Congress entered into an impassioned debate about whether this balance between political neutrality and freedom of speech for federal employees should be readjusted.  *See* Scott J. Bloch, *The Judgment of History: Faction, Political Machines, and the Hatch Act*, 7 U. Pa. J. of Lab. & Emp. L. 225, 231–32 (2005).  Its ultimate solution was enacted as the Hatch Act of 1939, of which Section 9(a) was the essence:

> It shall be unlawful for any person employed in the executive branch of the Federal Government, or any agency or department thereof, to use his official authority or influence for the purpose of interfering with an election or affecting the result thereof. No officer or employee in the executive branch of the Federal Government, or any agency or department thereof, shall take any active part in political management or in political campaigns. All such persons shall retain the right to vote as they may choose and to express their opinions on all political subjects.

An Act to Prevent Pernicious Political Activities (Hatch Act), ch. 410, 53 Stat. 1147 (1939). No longer binding solely on a subset of federal civil servants, the strictures of the Hatch Act now applied generally to executive branch employees. Congress preserved their right to express political opinions while limiting their right to engage in partisan activity whose impact on the political process was more direct.

Twice the constitutionality of the Hatch Act was challenged in the Supreme Court, and twice the Supreme Court upheld it. *See United Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75 (1947); *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548 (1973). In *Mitchell*, the Court recognized that "[t]he essential rights of the First Amendment in some instances are subject to the elemental need for order without which the guarantees of civil rights to others would be a mockery." *Mitchell*, 330 U.S. at 95. Congress' enactment of the Hatch Act was, accordingly, a reasonable outgrowth of its "conviction," grounded in the "teaching of experience," that "an actively partisan governmental personnel threatens good administration." *Id.* at 97–99; *see also Letter Carriers*, 413 U.S. at 557 (confirming what the Court called "the judgment of history . . . that federal service should depend upon meritorious performance rather than political service, and that the political influence of federal employees . . . on the electoral process

7

should be limited"). In a sense, many of the same considerations that underlie restrictions on political engagement by the federal judiciary also underlie the Hatch Act. The two situations are by no means identical, but there is a common belief that the distinct privilege of public service, in whatever capacity, may justify some modest set of restrictions on partisan engagements in return. "Another Congress" might one day decide differently but that decision is emphatically for Congress, not the Court. *Mitchell*, 330 U.S. at 99.

The Court recognized that the Hatch Act regime was thoughtfully established and tended with particular care. Congress amended the Hatch Act several times. Act of July 19, 1940, ch. 640, 54 Stat. 767; Act of Aug. 25, 1950, ch. 784, 64 Stat. 475; Federal Election Campaign Act Amendments of 1974, Pub. L. No. 93-443, 88 Stat. 1290. Congress also periodically held hearings to review the whole area as conditions changed in the civil service and in the nation at large. Bloch, *supra*, at 234–35. And in 1993, Congress observed that political patronage was no longer the problem it had once been. Instead, excessively partisan speech and conduct within the federal workplace was the danger most in need of being curbed. So, in the Hatch Act Reform Amendments of 1993, Congress loosened restrictions on federal employees' ability to participate in political campaigns outside of work and tightened restrictions on political activity undertaken in the course of civil service business. *See Burrus v. Vegliante*, 336 F.3d 82, 86 (2d Cir. 2003). On-duty federal civil servants were thereby prohibited from engaging in "political activity," 5 U.S.C. § 7324, where "political activity" came to mean "an activity directed toward the success or failure of a political party, candidate for partisan political office, or partisan political group," 5 C.F.R. § 734.101. And that remains the law today.

8

It is not for the judicial branch to second-guess the sober judgment of Congress that some separation of the civil service from partisan electioneering remains necessary. A principle of such legislative antiquity should not casually fall prey to debatable contemporary assessments that government agencies are now so reassuringly aloof from partisan antagonisms that the need for elemental restraints has definitively passed. For Congress could well believe that the project of realizing a politically neutral civil service, a project now over two centuries old, was more essential than ever in this most partisan and intolerant of times. An efficient and meritocratic civil service of federal employees devoted above all "to serve this great end of Government—the impartial execution of the laws," *Letter Carriers*, 413 U.S. at 565, may yet help to restore a fraying popular faith in our basic public bodies. Or so the legislative branch is entitled to conclude. That "great end of Government" is the great end of the Hatch Act too, and we hesitate to gainsay Congress' judgment to this effect.

III.

A.

It is not only the general purpose of the Hatch Act that defeats appellants' position. The way in which Congress has implemented that purpose is equally inhospitable to appellants' view.

We review *de novo* the district court's dismissal of appellants' complaint for lack of subject matter jurisdiction. *Moore v. Frazier*, 941 F.3d 717, 721 (4th Cir. 2019). Justiciability here turns on the details of the highly developed scheme Congress has provided for the Hatch Act's enforcement. To prevent the unnecessary chilling of speech,

9

Congress has empowered OSC to issue advisory opinions on the Hatch Act, which OSC offers as "forecast[s]" and "informal advice." *Am. Fed'n of Gov't Employees, AFL-CIO v. O'Connor*, 747 F.2d 748, 753–54 (D.C. Cir. 1984). Because OSC is the sole body tasked with investigating complaints and pursuing disciplinary action before the Merit Systems Protection Board, 5 U.S.C. § 1215, federal employees who act in conformity with OSC's advice effectively enjoy safe harbor from OSC prosecution. *See O'Connor*, 747 F.2d at 754; J.A. 5–6. Although a federal employee may reach a settlement with OSC, voluntarily accepting disciplinary measures to avoid prosecution before the MSPB, OSC has no authority to unilaterally impose discipline for perceived Hatch Act violations. 5 U.S.C § 1215; J.A. 4. It is to the MSPB alone that Congress has delegated the job of determining whether a Hatch Act violation has occurred and, if so, what discipline is appropriate. 5 U.S.C. §§ 1204, 1215; *O'Connor*, 747 F.2d at 753–54. As a matter of practice, discipline of any kind is seldom imposed. In each of the last three years, OSC received no fewer than two hundred complaints but the MSPB ultimately imposed discipline on no more than six occasions. J.A. 127–28. Furthermore, any employee facing an adverse judgment from the MSPB may proceed to the Federal Circuit Court of Appeals. 5 U.S.C. § 7703(b). Neither the MSPB nor the Federal Circuit are bound by any OSC advisory opinion.

The statutory enforcement scheme, therefore, runs a straight line from OSC to the MSPB to the Federal Circuit. This scheme is not only uniquely addressed to the particular question of partisan engagement among the federal workforce. It is also notable for one conspicuous absence. Nowhere in the statutory Hatch Act enforcement structure is there any role assigned to the Fourth Circuit or, indeed, to any regional circuit. Not having

10

received a legislative invitation to the party, we are loath to crash it. To recognize the primacy of the role of designated agencies and other courts is simply a matter of elemental respect for Congress' handiwork and the details of its design.

B.

The structure and purpose of the Hatch Act inform the justiciability analysis. OSC's post-election update of its guidance on impeachment and "the resistance" has removed AFGE's injury-in-fact and, therefore, mooted the case. This post-election guidance states, formally and unequivocally, that because Donald Trump is no longer a candidate for public office, OSC no longer considers advocacy for or against his impeachment, or use of terms like "resistance" to violate the Hatch Act. OSC, The Hatch Act and Activities after Election Day n.5 (Nov. 4, 2020). Because justiciability requires that there be a live controversy throughout the entirety of litigation, a case is moot if, at any point prior to the case's disposition, one of the elements essential to standing, like injury-in-fact, no longer obtains. *Townes v. Jarvis*, 577 F.3d 543, 546–47 (4th Cir. 2009). In cases involving the First Amendment, injury-in-fact may be established either by "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder," *Kenny v. Wilson*, 885 F.3d 280, 288 (4th Cir. 2018) (quoting *Babbitt v. Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)), or a "sufficient showing of self-censorship which occurs when a claimant is chilled from exercising his right to free expression," *id.* (quoting *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013)). These standards must, of course, be interpreted in light of the "fundamental requirements of Article III," which bar plaintiffs from "manufactur[ing]

11

standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).

The basic problem with appellants' argument is that the OSC guidance of which they complain is no longer in effect. The advisory opinions were rescinded for the simple reason that President Trump was no longer a candidate for public office. As a result, opinions with regard to him lacked, at least in OSC's view, the partisan thrust that would be evident in an ongoing political campaign. The guidance can no longer govern the appellants' conduct or in any way chill their proposed speech. Such would seem to present a classic case of mootness. Any credible threat of prosecution must arise, therefore, from actions AFGE took back when the Advisory Opinions represented OSC's considered view. This argument, however, falls short for several reasons. First, AFGE's complaint does not allege, with anything even approaching adequate specificity, that any of its members actually violated OSC's pre-election Advisory Opinions. Nor could conduct that was never violative of the Advisory Opinions in the first place present any threat of future prosecution that was anything other than highly remote and utterly speculative.

This case is not excepted from the usual live-controversy requirements because it is capable of repetition yet evading review. To fall within this exception, it must be the case that "the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and . . . there is a reasonable expectation that the same complaining party will be subjected to the same action again." *United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1540 (2018) (quoting *Turner v. Rogers*, 564 U.S. 431, 439–40 (2011)). The

record does not support either prong.  The latter is especially dubious given that there is no whiff of any of the opportunism, on the part of the defendant, that typically supports invocations of mootness exceptions where voluntary cessation of the challenged conduct is at issue.  *See Porter v. Clarke*, 852 F.3d 358, 364 (4th Cir. 2017).  OSC withdrew its pre-election guidance, not with the aim of avoiding judgment in court, but in response to the outcome of the presidential election.  Once Donald Trump was no longer a candidate for public office, it made no sense for OSC to maintain guidance that hinged on the fact that he was.  Under these conditions, the unreasonableness of expecting the challenged conduct to recur is "absolutely clear," *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000).

## C.

It may seem odd that a controversy can simultaneously be both moot and unripe.  But it is not odd at all.  For if a legal controversy be once dead, who knows at what time or in what form it might conceivably assume a second life.  Justiciability is often a matter of likelihood, and that in turn may require a practical predictive judgment.  *See Reno v. Catholic Social Services, Inc.*, 509 U.S. 43, 69 (1993) (O'Connor, J., concurring).

The particular role ripeness doctrine plays in the administrative context is, as the Supreme Court has said, "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect agencies from judicial interference until an administrative decision has been formalized . . . ."  *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49 (1967).  More generally, observing the requirements of ripeness preserves courts from

13

becoming embroiled in controversies not yet of a suitable form for judicial decision. *Mitchell*, 330 U.S. at 90. For "[i]t would not accord with judicial responsibility to adjudge, in a matter involving constitutionality, between the freedom of the individual and the requirements of public order except when definite rights appear upon the one side and definite prejudicial interferences upon the other." *Id.* It is with these ends in mind that we must consider ripeness' dual requirements, that is, "fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration." *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983) (quoting *Abbott Laboratories*, 387 U.S. at 149).

The issues in this case are not fit for judicial decision. In *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006), this court emphasized that a case is generally only fit for decision where "the action in controversy is final and not dependent on future uncertainties." In the First Amendment context, *Cooksey v. Futrell* found ripeness where "no further [government] action was required" for the plaintiff to experience a "non-speculative and objectively reasonable chilling effect of his speech." 721 F.3d 226, 236, 240–41 (4th Cir. 2013).

The mere issuance by OSC of a generally addressed advisory opinion falls well short of what is required. And that is, in fact, all that AFGE has brought before us. AFGE has not alleged that OSC has provided any individualized notice that OSC considers any of its members' conduct as even potentially in violation of the Hatch Act. It has not alleged that OSC has initiated an investigation into the conduct of the members here or that OSC has ever expressed any intention to file a complaint against them with the MSPB. Both OSC

14

and MSPB have remained quite on the sidelines. Indeed, the significance of their lack of involvement here can hardly be overstated. The MSPB is the body with the statutory authority to find that a federal employee has violated the Hatch Act and to impose discipline. Yet AFGE's complaint has not alleged a single instance in which the MSPB heard a dispute based on any conduct by AFGE, or any of its members, that was similar to the desired speech described in its members' affidavits.

This absence, on the part of both OSC and the MSPB, contrasts quite remarkably with *Cooksey*, where the North Carolina Board of Dietetics/Nutrition, the relevant governmental authority in that case, had issued Cooksey with a red-pen review of his website, complete with commentary, and assured him that it would continue to monitor his website for regulatory compliance in the future. *Id.* at 236–37. The North Carolina Board's "highest executive official" personally called Cooksey to remind him that she wielded the statutory authority to seek an injunction against him if he failed to comply with the Board's guidance. *Id.* at 236. Nothing like that happened here. To hold that an action as preliminary as OSC's issuance of a generally addressed advisory opinion can meet the ripeness standard would be, in reality, to strip the standard of any meaningful content.

The high level of generality at which AFGE has alleged the chilling effect on its members, coupled with the absence of any agency enforcement action, illustrates the soundness of the district court's conclusion with respect to ripeness. As to adjudicative fitness, the absence of further agency action would compel this court to speculate, improperly, as to whether AFGE's members' desired speech is in fact inconsistent with the Advisory Opinions. As to hardship, this court would be on even shakier ground. The

15

generality of AFGE's key allegations and the lack of OSC action deprive us of any solid foundation for finding that AFGE's members will suffer significant hardship if we dismiss the case. Having pleaded in such "sweeping generalit[ies]," *O'Connor*, 747 F.2d at 752, AFGE would, therefore, force our court into just the kind of "premature adjudication," *Abbott Laboratories*, 387 U.S. at 148–49, that the Supreme Court has warned against.

To appreciate the problem, it is helpful to return for a moment to the language in AFGE's affidavits. These affidavits have alleged, first, a desire to "express [an] opinion while at work on whether the President should be impeached" and, second, a desire to "use 'resist,' 'resistance,' and iterations of those terms . . . to express . . . views and opinions." J.A. 51, 53. The affidavits foreswear any concomitant desire to advocate for or against President Trump's impeachment in the workplace. *Id.* But the Advisory Opinions create a safe harbor for employees' simple expression of impeachment-related opinions. J.A. 49. As for "resistance" and its iterations, the Advisory Opinions specifically contemplate OSC's determinations being circumstance- and fact-specific. J.A. 46.

Something more concrete and particularized in the way of speech or conduct is thus required. Greater clarity might have been provided—costlessly and at no risk to AFGE's members—if they had requested, according to convenient and oft-used procedures, the issuance of individualized advisory opinions addressing the particular conduct in which AFGE's members hoped to engage. *See* J.A. 124–25 (indicating that OSC responds to over 1,000 such inquiries annually, some of which are made by email and telephone). Just as AFGE's concerns were primed for further development through established agency channels, however, plaintiffs thrust their case into the lap of this court. Not only are cases

16

saddled with such fundamental indeterminacy unsuited to resolution in an Article III forum. Where, as here, they arise in the administrative context, they represent an invitation to the premature interference in administrative affairs that the Supreme Court has explicitly rejected.

D.

There is a final difficulty with appellants' case. For our court to rule this case justiciable would upend the Hatch Act enforcement scheme whose details Congress has so meticulously set out. Here, AFGE has challenged a generally addressed OSC advisory opinion with general allegations of its own about some possible future speech that said advisory opinion has supposedly chilled. Nothing more. By asking us to find sufficient ripeness, AFGE is effectively asking this court to graft a parallel Article III "fast track" onto the congressional design. Instead of vindicating members' rights through the intrabranch and judicial processes devised specifically to govern Hatch Act disputes, AFGE would have us pave a way straight from OSC's "informal advice" to our court's final judgment.

The consequence would be to reduce dramatically the promulgation of advisory opinions. OSC currently produces over one-thousand advisory opinions each year through a sub-unit consisting of a mere six attorneys. J.A. 149. It is simply not plausible to suggest that such a limited body would be capable of providing a fraction of its current guidance if it were forced to conceive of each and every advisory opinion as a point of exposure to litigation costs. OSC's ability to ensure the Hatch Act functions "to *protect* employees' right[] . . . to free expression," *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454,

17

471 (1995) (emphasis in original), would thereby be diminished, and federal employees would themselves bear the costs of the resultant uncertainty. By seeking to win its dispute with OSC in a way certain to compromise the conditions securing free expression, AFGE has fallen victim to the law of unintended consequences. Fortunately, respect for ripeness doctrine saves us from the same mistake. We cannot plough under in a moment what Congress has deliberately shaped and refined over decades.

Government operates at many levels of formality, and it cannot be expected to function properly without some mix of formal and informal means. Not every conceivable question can come to Congress or an Article III court for a definitive formal ruling. And agency rules, regulations, and adjudications also have different levels of formality attached. Informal advisory opinions afford the government flexibility while at the same time affording both private and public individuals a more efficient, less expensive, and less protracted means of obtaining guidance and understanding. Advisory letters and opinions are omnipresent throughout government and indeed they exist not only in the executive branch but in the judicial branch as well. *See, e.g.*, 2B Committee on Codes of Conduct, Guide to Judiciary Policy, ch. 2 (2019) (listing almost one hundred published advisory opinions). To deprive government of this tool generally and in the specific context where Congress has contemplated it would be, quite frankly, a heavy blow. This is yet one more reason for courts to adhere to the cautions and limitations in our constitutionally prescribed role.

IV.

The problems with this suit are many and the potential damage it threatens so significant as to leave us no choice but to affirm the district court's dismissal of the action. As the Supreme Court has repeated, Congress acted lawfully in crafting a system that balances personal rights against the ideal of political neutrality in public service. AFGE has failed to show that, in this case, it would be lawful for us to intervene. For the reasons herein expressed, we shall affirm.

*AFFIRMED*