**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

No. 12-2212
_____

MARIA NICOLE DURDEN,

　　　　　　　Plaintiff - Appellant,

　　　v.

UNITED STATES OF AMERICA,

　　　　　　　Defendant - Appellee.

_____

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.　James C. Dever III, Chief District Judge.　(5:11-cv-00442-D)

_____

Argued: September 19, 2013　　　　Decided: November 20, 2013

_____

Before NIEMEYER, GREGORY, and FLOYD, Circuit Judges.

_____

Affirmed by published opinion.　Judge Floyd wrote the opinion, in which Judge Niemeyer and Judge Gregory concurred.

_____

**ARGUED:** Nathan Harrill, WAKE FOREST UNIVERSITY SCHOOL OF LAW, Winston-Salem, North Carolina, for Appellant.　Joshua Bryan Royster, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.　**ON BRIEF:** Joseph L. Anderson, ANDERSON PANGIA & ASSOCIATES, PLLC, Winston-Salem, North Carolina; Douglas P. Desjardins, TRANSPORTATION INJURY LAW GROUP, Washington, D.C., for Appellant.　Thomas G. Walker, United States Attorney, Jennifer P. May-Parker, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

_____

FLOYD, Circuit Judge:

On December 13, 2009, U.S. Army Specialist Aaron Pernell unlawfully entered the home of Maria Durden while inebriated and raped Durden in front of her children. Durden subsequently sued the government pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b), alleging that the Army was negligent and therefore is liable for the sexual assault against her. The government moved to dismiss Durden's complaint for lack of subject matter jurisdiction and, alternatively, for failure to state a claim upon which relief can be granted. The district court granted the government's motion with respect to subject matter jurisdiction, and Durden appealed. For the reasons set forth below, we affirm.

I.

A.

Pernell joined the Army at age eighteen and was deployed to Iraq after he completed his initial training in Georgia and a two-day stay at Fort Bragg, North Carolina. Upon returning to Fort Bragg subsequent to his deployment, Pernell struggled emotionally and began using drugs and abusing alcohol. In March and August of 2009, Pernell told his staff sergeant that he desired to kill himself and eleven current and former members of his unit. After each instance, the sergeant discouraged Pernell

2

from seeking mental-health treatment and cautioned Pernell that receiving such treatment could blemish Pernell's military record. In September 2009, Pernell confided in a fellow soldier that he was unable to sleep due to his drug and alcohol use; the solider also advised Pernell not to seek mental-health treatment because it could "mess up [Pernell's] career."

On September 10, 2009, Pernell burglarized a home in Fayetteville, North Carolina (which is adjacent to Fort Bragg) and assaulted the home's occupants with a pellet gun. Civilian law enforcement arrested Pernell and charged him with burglary and assault. Pernell was then detained at a civilian jail from September 11 to October 22, 2009, at which time his parents posted bail on his behalf and his platoon leader retrieved him and returned him to Fort Bragg. During the transport back to Fort Bragg, Pernell again expressed a desire to kill himself and eleven members of his unit.

Immediately upon Pernell's return to Fort Bragg, the Army began the process of administratively separating him. According to Durden, Pernell's commanding officer issued orders on October 22, 2009, that Pernell was to have a noncommissioned officer escort at all times—both off and on Fort Bragg—and was to be checked on hourly to ensure that he remained in his barracks. Durden alleges that the orders were given to "prevent harm to innocent base residents." Durden also claims that these

3

orders were not enforced. Specifically, Durden claims that Pernell was permitted to leave his barracks at night to use drugs and consume alcohol and, further, that Pernell's superior officers knew that Pernell violated the orders but did not act to ensure that the orders were followed.

The government paints a somewhat different picture of the restrictions placed on Pernell following his release from civilian jail and the reasons for the restrictions. According to the government, Pernell was not required to have an escort while on Fort Bragg, was not confined to his barracks, and was not required to be checked on hourly; rather, Pernell was required to have an escort only when he left Fort Bragg, which he could not do without first obtaining permission. Through an affidavit, the government asserts that revoking a soldier's leave-and-pass privilege off Fort Bragg is common while the soldier undergoes the process of being administratively separated, or subsequent to being in civilian confinement, "to ensure that the soldier [is] available for administrative proceedings and [does] not go absent without leave." The government also notes that Pernell received event-oriented counseling on October 22, 2009, at which time Pernell's commanding officer first learned of Pernell's desires to harm himself and others. The government claims that Pernell recanted these desires at that time; however, out of an abundance of

4

caution, the Army ordered that Pernell be checked on every two hours during the evening while in his barracks to ensure that he did not harm himself. Pernell then underwent a scheduled mental-health evaluation on October 30, 2009, after which it was determined that, inter alia, Pernell exhibited a low potential for self-harm and harm to others. As a result of this assessment, Pernell's commanding officer lifted the bihourly evening checks.

Pernell raped Durden on December 13, 2009, at Durden's residence on Fort Bragg. In January 2010, Pernell became a suspect in Durden's rape and consented to giving a DNA sample that was used to identify him as Durden's assailant. Pernell was also identified at that time as being involved in burglaries and sexual assaults that occurred in 2008 and 2009 in Fayetteville. Pernell subsequently requested mental-health treatment, and it was then determined that Pernell posed a medium risk of harm to himself and others. Following this evaluation, the Army—for the first time, according to the government—placed Pernell on barracks restriction and ordered that he be monitored at all times.

On December 8, 2010, a general court-martial convicted Pernell of raping Durden. As a result, Pernell was sentenced to fifty years' imprisonment, had his military rank reduced, and was dishonorably discharged from the Army. On August 11, 2011,

Durden sued the government. Durden alleged that the Army was aware that Pernell posed a safety risk to others, had a duty to protect her from Pernell, and breached that duty by failing to execute the October 22, 2009 orders that, according to Durden, required that Pernell be escorted at all times while on Fort Bragg and be checked on hourly when in his barracks.

The government moved to dismiss Durden's complaint for lack of subject matter jurisdiction and, alternatively, for failure to state a claim. Specifically, the government asserted that the Army did not breach any duty owed to Durden under North Carolina law and that Durden's complaint is barred by the FTCA's intentional-tort exception, 28 U.S.C. § 2680(h). The district court granted the government's motion, and Durden appealed. This Court has jurisdiction over Durden's appeal pursuant to 28 U.S.C. § 1291.

B.

This Court reviews de novo a district court's decision on a motion to dismiss for lack of subject matter jurisdiction. Cooksey v. Futrell, 721 F.3d 226, 234 (4th Cir. 2013). A defendant may contest subject matter jurisdiction in one of two ways: by attacking the veracity of the allegations contained in the complaint or by contending that, even assuming that the allegations are true, the complaint fails to set forth facts

6

upon which jurisdiction is proper.  Kerns v. United States, 585 F.3d 187, 192 (4th Cir. 2009).  Here, despite presenting a version of the facts that differs from Durden's version with respect to the restrictions placed on Pernell, the government's challenges to jurisdiction arise under the latter framework. Specifically, the government contends that Durden's allegations, even if true, do not establish that the Army acted negligently. Additionally and alternatively, the government argues that Durden's complaint is barred by the FTCA's intentional-tort exception.  Because these are facial—as opposed to factual— challenges to the complaint, Durden "is afforded the same procedural protection as [s]he would receive under a Rule 12(b)(6) consideration," Kerns, 585 F.3d at 192 (i.e., we "assume the truthfulness of the facts alleged," id. at 193).

On appeal, Durden opposes each of the government's bases for dismissal.  We address these bases in turn.

II.

A.

"As a sovereign, the United States is immune from all suits against it absent an express waiver of its immunity."  Welch v. United States, 409 F.3d 646, 650 (4th Cir. 2005).  The FTCA provides for one such waiver, wherein

7

the district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).

"An action [for negligence] under the FTCA may only be maintained if the Government would be liable as an individual under the law of the state where the negligent act occurred." Kerns, 585 F.3d at 194 (citing 28 U.S.C. § 1346(b)(1)). In North Carolina—where the Army's alleged negligent act or omission occurred—a defendant cannot be held liable for negligence absent a duty owed to the plaintiff and breach of that duty. Stein v. Asheville City Bd. of Educ., 626 S.E.2d 263, 267 (N.C. 2006). Accordingly, dismissal of Durden's complaint on the theory that the allegations are insufficient to give rise to a negligence claim requires us to look beyond the four corners of the complaint and to assess whether, under North Carolina law, the Army owed any duty to Durden and, if it did, whether it breached that duty.

This Court considered appeals arising under the same procedural posture as Durden's appeal in Kerns and Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc., 840 F.2d 236 (4th

8

Cir. 1988), but resolved those cases differently. In Kerns, this Court vacated the district court's dismissal for lack of subject matter jurisdiction, stating that where "the jurisdictional facts and the facts central to a tort claim are inextricably intertwined, the trial court should ordinarily assume jurisdiction and proceed to the intertwined merits issues." 585 F.3d at 193. Notably, the government in Kerns challenged the truthfulness of the allegations in the plaintiff's complaint—not merely their legal sufficiency, see id.—and this Court concluded that discovery "could" reveal information that might assist the plaintiff on the intertwined merits issue, id. at 196. By contrast, this Court in Rivanna, despite recognizing that the issue at hand was "both a question of subject matter jurisdiction and an element of appellants' asserted claims," treated the district court's dismissal for lack of subject matter jurisdiction as one for failure to state a claim that had been converted into a motion for summary judgment. 840 F.2d at 239.

This case is more akin to Rivanna than Kerns insofar as the government argued—and the district court held—that, even assuming that Durden's allegations are true, the complaint still fails to establish that the Army breached a duty to her under North Carolina law. See Durden v. United States, No. 5:11-CV-442-D, 2012 WL 3834934, at *8 (E.D.N.C. Aug. 31, 2012) ("Durden

9

satisfies the subject matter jurisdiction requirement that the government owed her a duty before the intentional tort was committed. . . . Durden's alleged facts do not establish that the government breached a duty that it owed to her." (citation omitted)); id. at *10 ("Even accepting as true Durden's allegations regarding the ways that the government restricted Pernell after Pernell returned to Fort Bragg following his September 10, 2009 arrest, Pernell's tendency to commit violent acts did not cause Pernell to be in the government's custody."); id. at *13 ("[A]ccepting as true Durden's allegations regarding the government's efforts to restrain Pernell, these allegations do not establish the existence [of] a duty owed by the government to Durden under North Carolina's version of the Good Samaritan Doctrine."). Moreover, as we explain in greater detail below, Durden's discovery requests, even if granted, would not assist her on the merits of the underlying negligence issue. Thus, despite the district court's "technically incorrect statement" purporting to dismiss Durden's complaint for lack of subject matter jurisdiction, "the court considered the [negligence] issue as though it were the basis of a motion to dismiss for failure to state a claim that had been converted into a motion for summary judgment." Rivanna, 840 F.3d at 239 (Powell, J. (Ret.), sitting by designation).

10

We turn now to whether the district court correctly determined that the government is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a) (standard for granting summary judgment). In doing so, we examine in turn Durden's three theories of a duty that the Army owed to her under North Carolina law and allegedly breached.

## B.

### 1.

In North Carolina, "a landlord has a duty to exercise reasonable care to protect his tenants from third-party criminal acts that occur on the premises if such acts are foreseeable." Davenport v. D.M. Rental Props., Inc., 718 S.E.2d 188, 189–90 (N.C. Ct. App. 2011). Durden's first theory of negligence, then, is that the Army, as landlord of Fort Bragg, breached a duty to protect her from Pernell's reasonably foreseeable attack.

> The most probative evidence on the question of whether a criminal act was foreseeable is evidence of prior criminal activity committed. However, certain considerations restrict [courts] as to which evidence of prior criminal activity is properly considered. General considerations are [1] the location where the prior crimes occurred, [2] the type of prior crimes committed, and [3] the amount of prior criminal activity.

11

Connelly v. Family Inns of Am., Inc., 540 S.E.2d 38, 41 (N.C. Ct. App. 2000) (citations omitted). Foreseeability may also be established by a landlord's knowledge of a specific threat against individuals. See Davenport, 718 S.E.2d at 191. Durden identifies two incidents that she believes render Pernell's rape of her foreseeable: Pernell's repeated expressed desires to kill himself and members of his unit (viewed collectively) and Pernell's September 10, 2009 burglary and assault in Fayetteville.[1] For the reasons set forth below, however, we hold that these incidents are not sufficient to render Pernell's rape of Durden "foreseeable" under North Carolina law.

As an initial matter, we reject for two reasons Durden's argument that Pernell's prior expressed desires to kill himself and members of his unit established foreseeability of the rape. First, even assuming that Pernell's desires tend to show that he had a propensity for violence, Durden has still failed to demonstrate how such desires fall within the purview of "prior criminal activity." See Connelly, 540 S.E.2d at 41 (emphasis

---

[1] Although Durden does not raise this argument, we note that Pernell's alcohol abuse and drug use, even if criminal acts, do not qualify as "prior criminal activity" for purposes of determining whether Pernell's rape of Durden was foreseeable for at least the reason that they are not the same type of prior crimes. See Connelly, 540 S.E.2d at 42 ("instances of public drunkenness, shoplifting, vandalism[,] and disorderly conduct" are not the types of incidents to be considered for purposes of establishing foreseeability of armed robbery).

12

added).  To wit, Durden has not alleged what "crime" the mere desire to harm or kill another person, without more, constitutes,[2] and North Carolina courts require more than the mere wishing of harm upon another person to establish criminal liability.  See, e.g., State v. Merrill, 530 S.E.2d 608, 612–13 (N.C. Ct. App. 2000) ("evidence [of] defendant's expressions of her desire that the victim be dead," absent assent to the murder plan, insufficient to support a conspiracy-to-murder charge); see also State v. Miller, 477 S.E.2d 915, 921 (N.C. 1996) (crime of attempt requires an overt act that "must reach far enough towards the accomplishment of the desired result to amount to the commencement of the consummation").  Second, setting aside the criminality (or not) of Pernell's desires, Durden has not demonstrated that the Army should have gleaned from those desires the notion that Pernell would sexually assault any tenant on Fort Bragg, let alone Durden specifically.  See Davenport, 718 S.E.2d at 191 (citing Anderson v. 124 Green Street LLC, No. 09-2626-H, 2011 WL 341709, at *3 (Mass. Super.

---

[2] Durden characterizes Pernell's desires to kill himself and others as "threats."  Pernell, however, did not state in his affidavit that he ever intended to act on his desires or that he communicated the desires to those members of his unit whom he wished to harm; rather, Pernell indicated that he expressed the desires to his staff sergeant and platoon leader in an effort to receive mental-health treatment because, according to Pernell, "[he] knew a report of that kind ought to automatically trigger [his] commitment to a mental health facility."

13

Ct. Jan. 21, 2011) ("A duty to evict . . . may arise where the landlord knows of a specific threat that one tenant poses to another . . . .")).

Turning now to the September 10, 2009 burglary and assault—indeed, a prior criminal activity—we are satisfied that it meets the second of Connelly's three foreseeability criteria insofar as it qualifies as the same "type of prior crime[]" as Pernell's subsequent rape of Durden. See, e.g., Murrow v. Daniels, 364 S.E.2d 392, 397-98 (N.C. 1988) (prior crimes of armed robbery, kidnapping, assault, vehicle theft, and larceny deemed relevant for determining whether sexual assault against plaintiff was foreseeable). With respect to the first prong—"the location where the prior crimes occurred"—the North Carolina Supreme Court has been clear that "evidence pertaining to the foreseeability of [a] criminal attack shall not be limited to prior criminal acts occurring on the premises," and "criminal acts occurring near the premises in question may be relevant to the question of foreseeability." Id. at 397 (citation omitted) (internal quotation marks omitted). However, decisions subsequent to Murrow have fashioned Murrow's language as an "exception" limited to "criminal activity in the area immediately surrounding [the] defendant['s] premises." Purvis v. Bryson's Jewelers, Inc., 443 S.E.2d 768, 770 (N.C. Ct. App. 1994) (considering only prior criminal activity that occurred

14

within three blocks of defendant's property); see Bennett v. Equity Residential, 692 S.E.2d 489 (N.C. Ct. App. 2010) (unpublished table decision) (considering only prior criminal activity that occurred within the defendant's apartment complex where plaintiff resided).

Here, there is no indication in the record regarding the physical distance between the site of the September 10, 2009 burglary and assault in Fayetteville and the site of Pernell's rape of Durden on Fort Bragg. Although one incident occurred off the military installation and the other on the military installation, North Carolina courts do not appear to be concerned with such formal line-drawing. See Connelly, 540 S.E.2d at 42 (considering, for a crime that occurred in North Carolina, prior criminal activity that occurred at the same interstate-highway intersection but on the South Carolina side of the intersection). Nevertheless, it is possible that if the September 10, 2009 burglary and assault was sufficiently far away from Pernell's rape of Durden, then it is "too remote to guide [the] determination" of foreseeability. Id. at 41 (excluding from a foreseeability analysis prior crimes that occurred in a neighboring town twenty miles away). Absent additional information about the distance between the locations of the incidents, however, we are unable to determine how relevant—if at all—the September 10, 2009 incident is in a

15

foreseeability calculus with respect to Pernell's rape of Durden.

Regardless, even assuming that Pernell's September 10, 2009 burglary and assault is sufficiently near in proximity to the rape, Durden's argument that the rape was foreseeable fails on Connelly's third criterion—"the amount of prior criminal activity." Durden does not identify any additional criminal activity—other than Pernell's expressed desires to kill himself and others, which we have already excluded categorically—that occurred prior to the rape and that should have alerted the Army that it was foreseeable that she would be attacked. Cf. Murrow, 364 S.E.2d at 397-98 ("The plaintiff presented evidence that one hundred incidents of criminal activity at the [relevant] intersection area had been reported to the sheriff's department [during the four and a half years leading up to the crime]."); Connelly, 540 S.E.2d at 42 ("The evidence in this case . . . indicates that in the five years preceding the armed robbery . . . , one hundred instances of criminal activity bearing on the issue of foreseeability occurred at the [relevant] intersection."); Urbano v. Days Inn of Am., Inc., 295 S.E.2d 240, 242 (N.C. Ct. App. 1982) (denying summary judgment on negligence claim where defendant "knew of at least 42 episodes of criminal activity taking place on its motel premises during a period of three years preceding the date of plaintiff's injury,"

16

and "[a]t least 12 of the episodes occurred during the three and one half months preceding plaintiff's injury"). Rather, Durden points to a single incident—Pernell's September 10, 2009 burglary and assault—which is not sufficient in hindsight to render a future attack foreseeable for purposes of landlord liability. See Davenport, 718 S.E.2d at 191 (citing Anderson, 2011 WL 341709, at *3 ("A duty to evict . . . may arise . . . where there is a history of violence by one tenant against other tenants." (emphasis added))).

Accordingly, Durden has failed to establish that Pernell's rape of her was foreseeable under North Carolina law, and thus the Army did not breach a duty owed to her as landlord of Fort Bragg.

2.

"In general, there is neither a duty to control the actions of a third party, nor to protect another from a third party." Scadden v. Holt, 733 S.E.2d 90, 92 (N.C. Ct. App. 2012). However, certain "[s]pecial relationships create a responsibility to take affirmative action for the aid or protection of another, and they arise only in narrow circumstances." Bridges v. Parrish, 742 S.E.2d 794, 797 (N.C. 2013) (citation omitted) (internal quotation marks omitted). A "special relationship" can arise between the defendant and the

17

plaintiff, or between the defendant and a third-party tortfeasor. Scadden, 733 S.E.2d at 93 n.2. When the latter type of special relationship exists, "there is a duty upon the actor to control the [tortfeasor's] conduct and to guard other persons against his dangerous propensities." King v. Durham Cnty. Mental Health Developmental Disabilities & Substance Abuse Auth., 439 S.E.2d 771, 774 (N.C. Ct. App. 1994) (citation omitted) (internal quotation marks omitted). Durden's second theory of negligence, then, is that the Army had a special relationship with Pernell, owed to her a duty to protect her from Pernell pursuant to that relationship, and breached that duty when Pernell raped her.

Durden claims that the Army had a special relationship with Pernell insofar as the Army (1) "[knew] or should [have] know[n] of [Pernell's] violent propensities" and (2) "ha[d] the ability and opportunity to control [Pernell] at the time" that he raped Durden. Stein, 626 S.E.2d at 269 (setting forth the two-pronged test for a special relationship). Even assuming, arguendo, that Durden can satisfy both prongs of the special-relationship test and, moreover, that the government was negligent in failing to control Pernell, Durden's claim that the government is liable pursuant to the FTCA still fails. That is because "[t]he ability and opportunity to control [a third party] must be more than mere physical ability to control. Rather, it must rise to

18

the level of custody, or legal right to control." Scadden, 733 S.E.2d at 93. The FTCA is clear, however, that the government is liable only "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1) (emphasis added). Thus, setting aside the Army's ability to control Pernell that attached solely pursuant to his employment status as a soldier, the Army must have had some other legal authority to control him. But Durden cannot demonstrate (nor has she alleged) that the Army had the ability to control Pernell pursuant to some legal authority independent of Pernell's employment status and, accordingly, the Army cannot be said to have a "special relationship" with him for purposes of an FTCA claim. See Stein, 626 S.E.2d at 269. Durden's second theory of negligence therefore also fails.

3.

"[U]nder certain circumstances, one who undertakes to render services to another which he should recognize as necessary for the protection of a third person, or his property, is subject to liability to the third person for injuries resulting from his failure to exercise reasonable care in such undertaking." Quail Hollow E. Condo. Ass'n v. Donald J. Scholz Co., 268 S.E.2d 12, 15 (N.C. Ct. App. 1980). Durden's final

19

theory of negligence, then, is that by undertaking the task of monitoring and controlling Pernell following his release from civilian confinement, the Army voluntarily assumed a duty to protect her from Pernell and breached that duty when Pernell raped her. However, this theory of a duty fails for two reasons.

First, Durden cannot demonstrate that the Army should have recognized that enforcing the October 22, 2009 orders, as Durden alleges, was necessary for the protection of others. On this issue, Lumsden v. United States, 555 F. Supp. 2d 580 (E.D.N.C. 2008), is instructive. In Lumsden, Marine corpsmen returned to the tortfeasor (also a corpsman) his vehicle after the vehicle was impounded when it was discovered that he was inhaling ether. Id. at 582. Upon the return of his vehicle, the corpsman became intoxicated on ether that remained in his vehicle and, as a result, he injured the plaintiffs and killed one other person. Id. The court denied the government's motion to dismiss the plaintiffs' FTCA claim and allowed the lawsuit to proceed on a general negligence theory. See id. at 589-90. Specifically, the court noted that,

> If the plaintiffs can show that the Government's agents knew or had reason to know that upon being provided the keys to his car and a canister of ether, [the corpsman] would become intoxicated at his first opportunity and immediately would attempt to drive on a public street while so intoxicated, then the agents'

20

> "behavior thus triggers duty [because] the risk is both unreasonable and foreseeable."

Id. at 589 (second alteration in original) (quoting Mullis v. Monroe Oil Co., 505 S.E.2d 131, 136–37 (N.C. 1998)).

In contrast to the tortfeasor in Lumsden, Pernell had been released from civilian confinement for more than six weeks prior to raping Durden, and there is nothing in the record to indicate that the Army should have known that Pernell was a threat to Durden's safety based solely on the September 10, 2009 incident or his prior expressed desires to kill himself and members of his unit.  At the time that Pernell raped Durden, the Army had no reason to suspect that Pernell committed the burglaries and sexual assaults that occurred in 2008 and 2009 in Fayetteville; indeed, it was only after Pernell raped Durden and became a suspect in that rape that authorities also identified him as being involved in the prior incidents.  It might be a different case if the Army knew that it was one of its own soldiers, and Pernell specifically, that committed the 2008 and 2009 sexual assaults in Fayetteville.  Under those circumstances, the Army may have had reason to know that Pernell was a serial offender and thus owed to Durden a duty to control Pernell upon his release from civilian confinement. Cf. id. at 582 ("[T]he Marine Corps, through its agents or officers, were aware that [the tortfeasor] had, on several occasions, acquired and inhaled the

21

chemical compound, ether, belonging to the Government." (emphasis added)). Durden does not dispute, however, that the Army did not become aware that Pernell was involved with the 2008 and 2009 crimes until after Pernell raped her.

Second, Durden has not presented any authority suggesting that, "under similar circumstances, a private person in North Carolina would be found to have owed a duty of ordinary care to persons in [Durden's] position." Id. at 589–90; see 28 U.S.C. § 1346(b)(1) (holding the government liable only "under circumstances where the United States, if a private person, would be liable"). Stated otherwise, Durden has presented no authority suggesting that a private person—even knowing of Pernell's September 10, 2009 burglary and assault, Pernell's expressed desires to kill himself and members of his unit, and Pernell's frequent drug and alcohol abuse—would have been required (or permitted, for that matter) by law to place Pernell under twenty-four-hour surveillance and to confine him to his barracks or a civilian equivalent thereto. To hold otherwise would render every private individual liable for the intentional torts of another person against unknown third parties simply because the individuals knew that the tortfeasor abused alcohol and drugs and committed a violent crime at some point in the past.

22

Accordingly, Durden's argument that the government breached a voluntarily assumed duty to protect her fails.

C.

Durden also argues that "[t]he District Court abused its discretion by transforming the [Rule] 12(b)(1) motion into a judgment on the merits without the opportunity for discovery or cross-examination of the witnesses making affidavits, and especially where the jurisdictional question and the merits of the appellant's claim were intertwined."  In particular, Durden seeks discovery pertaining primarily to what Pernell's commanding officers knew regarding Pernell's allegedly violent propensities and the extent of the restrictions placed upon him. But Durden has failed to set forth what additional information might be uncovered through discovery beyond the statements in Pernell's affidavit and, moreover, how that information might render the government liable under any of her three theories of negligence.  For even if Durden were granted the discovery that she requests, and even if her allegations regarding the orders given by Pernell's commanding officer were confirmed, her theories of negligence would still fall short of the Army being liable for her injuries.  Accordingly, the district court did not abuse its discretion by ruling on the government's motion without granting discovery to Durden.  See Carefirst of Md.,

23

Inc. v. Carefirst Pregnancy Ctrs., Inc., 334 F.3d 390, 402–03 (4th Cir. 2003) (standard of review for decisions regarding jurisdictional discovery).

First, with respect to Durden's theory of negligence based on landlord liability, Durden does not seek discovery regarding the Army's knowledge of any and all incidents of "prior criminal activity" on Fort Bragg that might render Pernell's rape of Durden "foreseeable" under North Carolina law, see Connelly, 540 S.E.2d at 41; rather, Durden's discovery requests pertain to "the full extent of [the] awareness [of Pernell's commanding officer], or the awareness of others in the chain of command, of the dangerous propensities of Pernell," and any "regulations, procedures, and policies regarding the duties of the [Army] as landlord." But Durden has not shown how information pertaining to Pernell, specifically, and military policy, generally, comes to bear on the foreseeability of a rape on Fort Bragg. See id. (foreseeability determined by "prior criminal activity," which is limited to "[1] the location where the prior crimes occurred, [2] the type of prior crimes committed, and [3] the amount of prior criminal activity").

Second, with respect to Durden's theory of negligence based on a "special relationship" between the Army and Pernell, Durden simply has not demonstrated how factfinding would assist her in developing a new legal theory under which the Army had the

24

ability to control Pernell independent from his status as a soldier (i.e., government employee). See Scadden, 733 S.E.2d at 93; see also 28 U.S.C. § 1346(b)(1).

And third, with respect to Durden's theory of negligence pursuant to a voluntarily assumed duty, Durden has not set forth what additional information the Army might have known about Pernell prior to the rape and that she might learn during discovery that would render the government liable. Presumably, Pernell made known in his affidavit all facts relevant to his criminal history and any propensity for violence or, at a minimum, Durden would have alleged that Pernell had such a criminal history. Discovery, then, would serve the purpose of determining whether the Army knew of Pernell's criminal history; however, discovery is not for the purpose of learning new information about Pernell that the Army would have had no reason to know or undisputedly did not know prior to Pernell's rape of Durden. Pernell's affidavit does not state that he committed any prior crimes that should have put the Army on notice that he was a serial offender, and Durden does not dispute the government's claim that it was only after Pernell raped Durden and gave a DNA sample that Pernell was linked to the 2008 and 2009 burglaries and sexual assaults in Fayetteville. Thus, although Durden's claim that relevant evidence is "held exclusively within the walls of the defendant" might be true

25

with respect to what the Army knew about Pernell prior to the rape, Durden has not put forth any facts or information about Pernell that she believes that the Army knew in the first instance and that she would know by way of Pernell. Accordingly, discovery would serve no purpose, and it was not error for the district court to reach the merits of Durden's claim at this stage of the litigation.

III.

As an alternative basis for dismissing Durden's complaint, the district court held that the fact that the Army gained knowledge of Pernell's allegedly violent propensity via his government employment was enough to nullify Durden's claims pursuant to the FTCA's intentional-tort exception. The district court overstated the exception's reach, however, and therefore we conclude that the district court erred in dismissing Durden's complaint on this alternative basis.

The FTCA carves out an exception to its own general waiver of immunity that bars recovery for "[a]ny claim arising out of assault[] [or] battery." 28 U.S.C. § 2680(h). The Supreme Court defined the scope of the intentional-tort exception in Sheridan v. United States, 487 U.S. 392 (1988). In Sheridan, three naval corpsmen encountered the tortfeasor, also a naval employee, in a drunken stupor in the hallway of a naval

26

hospital.  Id. at 394–95.  The corpsmen "attempted to take [the tortfeasor] to the emergency room, but he broke away, grabbing [his] bag and revealing the barrel of the rifle."  Id. at 395. The corpsmen then fled from the scene and took no further action to restrain the tortfeasor or to alert authorities that the tortfeasor was intoxicated and in possession of a firearm.  Id. The tortfeasor later shot and injured one of the plaintiffs and damaged the plaintiffs' vehicle.  Id.  The plaintiffs then sued the government by way of the three corpsmen for negligently allowing the tortfeasor to leave the hospital with a gun while "obviously intoxicated."  Id. at 393–94.

The district court in Sheridan dismissed the plaintiffs' complaint as barred by the intentional-tort exception, and this Court affirmed, holding that "§ 2680(h) bars actions alleging negligence of the supervising employees when the underlying tort is an assault or battery by a government employee."  Sheridan v. United States, 823 F.2d 820, 823 (4th Cir. 1987).  The Supreme Court, however, reversed and allowed the plaintiffs' claim against the government to proceed, reasoning that

> the mere fact that [the tortfeasor] happened to be an off-duty federal employee should not provide a basis for protecting the Government from liability that would attach if [he] had been an unemployed civilian patient or visitor in the hospital. Indeed, in a case in which the employment status of the assailant has nothing to do with the basis for imposing liability on the Government, it would seem perverse to exonerate

27

the Government because of the happenstance that [the tortfeasor] was on a federal payroll.

Sheridan, 487 U.S. at 402.

Here, the district court below held that, unlike in Sheridan—where the drunken tortfeasor's status as a government employee was wholly irrelevant to imposing liability on the government for the corpsmen's negligence—Pernell's status as a government employee was a but-for element of Durden's negligence claim, thus barring the claim. Specifically, the district court held that "even if the government's knowledge of Pernell's tendency to commit criminal acts made Pernell's assaulting Durden foreseeable to the government before December 13, 2009, section 2680(h) still negates the court's subject matter jurisdiction. After all, the government only acquired such knowledge in the course of Pernell's employment." Durden, 2012 WL 3834934, at *9; see id. ("[B]ecause the government's knowledge of [Pernell's] tendency to commit criminal acts stemmed solely from [his] government employment, the government's breach of any duty owed to [Durden] was not independent of the employment relationship." (citing Bajkowski v. United States, 787 F. Supp. 539, 541–42 (E.D.N.C. 1991) ("If [the tortfeasor] were not an employee of the Army, the Army would not have had . . . knowledge of his prior criminal and assaultive behavior . . . ."))). The same could be said,

28

however, about the corpsmen's knowledge of the intoxicated tortfeasor in Sheridan: presumably, the corpsmen alleged to have acted negligently would not have been present in the naval hospital that night—and thus would not have gained knowledge of the drunken tortfeasor and put themselves in a position to be negligent in the first instance—were it not for their government employment.

Accordingly, we hold that, although the government's ability (i.e., legal duty) to control a tortfeasor must be independent of the tortfeasor's status as a government employee, knowledge of the tortfeasor's propensity for violence or criminal history gained as a result of such status does not, per se, nullify an FTCA claim. The district court's dismissal on this alternative basis was therefore erroneous.

IV.

For the reasons set forth above, we affirm the district court's grant of summary judgment to the government.

AFFIRMED

29