**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

**No. 20-2266**

SAQIB ALI,

Plaintiff – Appellant,

v.

LAWRENCE JOSEPH HOGAN, JR.; BRIAN E. FROSH,

Defendants – Appellees.

Appeal from the United States District Court for the District of Maryland, at Baltimore. Catherine C. Blake, Senior District Judge.  (1:19-cv-00078-CCB)

Argued:  December 7, 2021                    Decided:  February 18, 2022

Before KING, THACKER, and HARRIS, Circuit Judges.

Affirmed as modified by published opinion.  Judge King wrote the opinion, in which Judge Thacker and Judge Harris joined.

**ARGUED**:  Gadeir Ibrahim Abbas, COUNCIL ON AMERICAN ISLAMIC RELATIONS, Washington, D.C., for Appellant.  Adam Dean Snyder, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees.  **ON BRIEF:**  Lena F. Masri, Justin Sadowsky, COUNCIL ON AMERICAN ISLAMIC RELATIONS, Washington, D.C., for Appellant.  Brian E. Frosh, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees.

KING, Circuit Judge:

Plaintiff Saqib Ali seeks to pursue 42 U.S.C. § 1983 proceedings in the District of Maryland against that State's Governor and Attorney General, challenging as unconstitutional an executive order of the Governor that prohibits boycotts of Israel by business entities that bid on the State's procurement contracts. In October 2020, the district court dismissed with prejudice Ali's lawsuit for want of Article III standing to sue. Ali has appealed that ruling and, as explained herein, we affirm the judgment. In so ruling, however, we modify the judgment and provide that the dismissal is without prejudice.

I.

A.

In October 2017, Governor Lawrence J. Hogan, Jr., issued Executive Order 01.01.2015.25 (the "Executive Order") entitled "Prohibiting Discriminatory Boycotts of Israel in State Procurement." *See* J.A. 28.[1] The Executive Order refers to a "Declaration of Cooperation" between Maryland and Israel, which has, "for more than two decades, enabled the successful exchange of commerce, culture, technology, tourism, trade, economic development, scholarly inquiry, and academic research." *Id.* Furthermore, it recognizes that "[b]oycotts of people or entities because of their Israeli national origin, or

---

[1] Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.

2

residence or incorporation in Israel and its territories, undermines the Declaration of Cooperation" between Maryland and Israel. *Id.*

The Executive Order recites that Maryland "has a longstanding and broad policy to refrain from contracting with business entities that unlawfully discriminate" through the "solicitation, selection, hiring, or commercial treatment of vendors." *See* J.A. 29. It specifies that "[t]he termination or refusal to transact business activities with people or entities because of their Israeli national origin, or residence or incorporation in Israel and its territories, is not a commercial decision made for business or economic reasons." *Id.* at 28. The Executive Order also recites that "[b]usiness entities that employ such unsound business practices" have "impaired commercial viability," "pose undue risks as contracting partners," and "may not provide the best possible products or services." *Id.*

Pertinent to this appeal, Section A of the Executive Order defines a "business entity" to include a "sole proprietorship," including any "contractor, supplier, or vendor . . . that has submitted a bid or proposal for . . . providing goods or services to the State." *See* J.A. 29-30. Additionally, Section A defines a "[b]oycott of Israel" as being "the termination of or refusal to transact business activities, or other actions intended to limit commercial relations, with a person or entity because of its Israeli national origin, or residence or incorporation in Israel and its territories." *Id.* at 29. That definition includes limited exceptions, such as actions taken that are "not commercial in nature," "for business or economic reasons," or "because of the specific conduct of the person or entity." *Id.*

Next, Section B of the Executive Order appears to broadly prohibit state contracting with business entities that engage in boycotts of Israel. It provides that state "[e]xecutive

3

agencies may not execute a procurement contract with a business entity unless [that entity] certifies, in writing when the bid is submitted or the contract is renewed," that (1) the entity "is not engaging in a boycott of Israel" and (2) the entity "will, for the duration of its contractual obligations, refrain from a boycott of Israel." *See* J.A. 30.

Finally, however, Section C of the Executive Order spells out the required certification — which must be signed by the bidding entity — in terms that are more circumscribed than those of Section B. The Section C certification focuses on whether the business entity has engaged in anti-Israel national origin discrimination in preparing its bid, rather than on whether the bidder is otherwise engaging in a boycott of Israel. More specifically, the Section C certification reads as follows:

> The undersigned bidder hereby certifies and agrees that the following information is correct: In preparing its bid on this project, the bidder has considered all proposals submitted from qualified, potential subcontractors and suppliers, and has not, in the solicitation, selection, or commercial treatment of any subcontractor, vendor, or supplier, refused to transact or terminated business activities, or taken other actions intended to limit commercial relations, with a person or entity on the basis of Israeli national origin, or residence or incorporation in Israel and its territories. The bidder also has not retaliated against any person or other entity for reporting such refusal, termination, or commercially limiting actions. Without limiting any other provision of the solicitation for bids for this project, it is understood and agreed that, if this certification is false, such false certification will constitute grounds for the State to reject the bid submitted by the bidder on this project, and terminate any contract awarded based on the bid.

*See* J.A. 30-31. The same certification is included in Maryland's solicitation and invitation for bid documents, with minor changes in terminology so that it applies to both bids and proposals for state procurement contracts. *Id.* at 192.

4

B.

1.

In January 2019, plaintiff Ali filed a 42 U.S.C. § 1983 civil action in the District of Maryland, seeking both declaratory and injunctive relief. *See Ali v. Hogan*, No. 1:19-cv-00078 (D. Md. Jan. 9, 2019), ECF No. 1 (the "Initial Complaint"). Named as defendants were Governor Hogan and Attorney General Brian E. Frosh, each in his official capacity only. The Initial Complaint asserted that the Executive Order contravenes Ali's rights to free speech and assembly, as protected by the First and Fourteenth Amendments. According to the Initial Complaint, "Ali is a computer software engineer who wishes to submit bids for government software project contracts but is barred from doing so due to the presence of mandatory 'No Boycott of Israel' clauses" in the Executive Order. *See* Initial Complaint ¶ 4.

The Initial Complaint alleged that Ali, in his personal capacity, participates in the "Boycott, Divestment, and Sanctions" movement, or "BDS," which "seeks to impose economic pressure on Israel to substantially alter the country's practices and policies regarding Palestinians." *See* Initial Complaint ¶ 15. As part of that effort, Ali personally "refuses to purchase Sabra hummus or SodaStream products, which have ties to Israel and its occupation of Palestine." *Id.* ¶ 35. Ali has also "dedicated himself to education and advocacy regarding the plight of the Palestinian people," and he "works to enlist as many members of the public as possible in joining him in non-violent opposition to Israel's maltreatment of Palestinians." *Id.* ¶ 34. For example, in 2014, Ali organized a group called "Freedom2Boycott in Maryland," described in his Initial Complaint as "a coalition of

5

statewide grassroots activists opposed to Maryland's legislative proposals targeting the BDS movement." *Id.* ¶ 37. It was alleged therein that the Freedom2Boycott group "ultimately helped defeat [various] anti-BDS legislative proposals" prior to the Governor's issuance of the Executive Order. *Id.*

The Initial Complaint did not allege that Ali has engaged in boycotts of Israel in his professional capacity as a software engineer. Rather, it maintained that, as a result of Ali's personal boycotts of Israel-tied products, the Executive Order bars him "from even submitting a bid" for any state procurement contracts. *See* Initial Complaint ¶ 41. The Initial Complaint identified "two projects for which . . . Ali is generally qualified" but cannot submit bids "due to the bids' inclusion of 'No Boycott of Israel' certifications required by [the] Executive Order." *Id.* ¶¶ 40-41. In explaining how the Section C certification bars Ali from submitting bids, the Initial Complaint specified that "Ali cannot certify in good faith that he has not 'refused to transact or terminated business activities, or taken other actions intended to limit commercial relations, with a person or entity on the basis of Israeli national origin, or residence or incorporation in Israel and its territories.'" *Id.* ¶ 42 (quoting Section C of Executive Order).

2.

In early October 2019, on the Governor's motion, the district court dismissed the Initial Complaint for lack of Article III standing. As explained in the court's memorandum opinion, it was significant to the court that — notwithstanding the broad language of Section B suggesting that the Executive Order reaches plaintiff Ali's personal boycotts of Israel-tied products — the Governor had presented an interpretation of the Executive Order

6

in this litigation that "prohibits only national-origin discrimination against Israelis in the formation of a bid for a state contract." *See Ali v. Hogan*, No. 1:19-cv-00078, at 1 (D. Md. Oct. 1, 2019), ECF No. 20 (the "First Dismissal Opinion"). To limit the scope of the Executive Order, the Governor's construction relies on the narrower language of the Section C certification. Under that interpretation, "Ali and other potential state contractors [are] free to boycott Israel and Israeli companies outside the bid formation process without compromising their eligibility to receive and maintain procurement contracts with the state." *Id.*

Although Ali contested the Governor's interpretation of the Executive Order and argued that it "strains credulity," the district court deemed it to be sufficiently plausible to call into question Ali's Article III standing to sue, to the extent it was premised on a direct injury. *See* First Dismissal Opinion 7-8. The court explained that "[g]iven the current allegations" concerning Ali's personal boycotts of Israel-tied products, along with "the Governor's express disavowal of any prohibitive effect [of the Executive Order] beyond national origin discrimination in the preparation of the bid," there was "not a sufficient controversy to go forward on the basis of a direct injury incurred by Mr. Ali." *Id.* at 8.

The district court recognized, however, that Ali could perhaps obtain Article III standing premised on a direct injury by bidding on a state procurement contract and having his bid rejected. *See* First Dismissal Opinion 8-9. For example, Ali could execute the Section C certification in reliance on the Governor's construction of the Executive Order and have the bid rejected — in line with Ali's reading of the Executive Order — because of his personal boycotts of Israel-tied products. Or, the court explained, Ali could submit

7

a bid to the State without the Section C certification and have it rejected on that basis. As the court put it, "[t]o proceed on the basis of a direct injury, Mr. Ali should submit a bid." *Id.* at 9.[2]

After assessing the circumstances, the district court resolved that "[t]he most prudent course of action" was to dismiss the Initial Complaint without prejudice, and afford Ali an opportunity to obtain Article III standing to sue. *See* First Dismissal Opinion 10-11. As such, by its order of that same day, the court dismissed Ali's civil action without prejudice and granted him leave to amend the Initial Complaint within 28 days. *See Ali v. Hogan*, No. 1:19-cv-00078 (D. Md. Oct. 1, 2019), ECF No. 21.

C.

1.

In late October 2019 — without first submitting a bid to the State — Ali filed his amended complaint, again seeking declaratory and injunctive relief. *See Ali v. Hogan*, No. 1:19-cv-00078 (D. Md. Oct. 29, 2019), ECF No. 22 (the "Amended Complaint"). The Amended Complaint advances two 42 U.S.C. § 1983 claims against Governor Hogan and

---

[2] In dismissing the Initial Complaint, the district court observed that Ali might demonstrate standing to sue under the relaxed requirements applicable in First Amendment cases, by making "a sufficient showing of self-censorship," i.e., that he "is chilled from exercising his right to free expression." *See* First Dismissal Opinion 9-10 (quoting *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013)). But because Ali had not sufficiently pleaded or briefed the issue, the court declined to rule on it. Rather, the court advised that if Ali "wishes to argue that First Amendment justiciability rules save his claim[], he must file an amended complaint plausibly alleging that his First Amendment activities have been chilled or that despite the Governor's interpretation of the [Executive] Order, 'it is likely to deter a person of ordinary firmness from the exercise of First Amendment rights.'" *Id.* at 10-11 (quoting *Cooksey*, 721 F.3d at 236).

Attorney General Frosh in their official capacities. First, like the Initial Complaint, the Amended Complaint alleges that the Executive Order abridges Ali's rights to free speech and assembly, as protected by the First and Fourteenth Amendments. Second, the Amended Complaint newly asserts that the Executive Order is unconstitutionally vague, in contravention of the Due Process Clause of the Fourteenth Amendment.

The Amended Complaint incorporates the allegations of the Initial Complaint that, because of Ali's personal boycotts of Israel-tied products, he is barred by the Executive Order from submitting bids on state procurement contracts. Once more, Ali describes his boycott activities as personally "refus[ing] to purchase Sabra hummus or Sodastream products." *See* Amended Complaint ¶ 48. Along with the two projects identified in the Initial Complaint, the Amended Complaint specifies "four additional bid proposals that Ali is interested in and, absent the No Boycott of Israel provision, would have liked to submit bids for." *Id.* ¶¶ 53, 57. The Amended Complaint reiterates Ali's belief that he cannot sign the Executive Order's Section C certification "in good faith" and "is thus barred from even submitting bids for any state contracts." *Id.* ¶ 55. In four new allegations, the Amended Complaint disputes the Governor's construction of the Executive Order. *Id.* ¶¶ 27-30. Also for the first time, the Amended Complaint alleges that the Section C certification constitutes an unconstitutionally vague loyalty oath. *Id.* ¶ 56.

Relevant to the district court's advice that Ali could bid on a state procurement contract to obtain Article III standing to sue, the Amended Complaint asserts that "[t]he consequences of Ali attempting to bid but then later finding out that the Governor's interpretation propounded in this action has been changed, or found invalid, would be

9

substantial." *See* Amended Complaint ¶ 31. That is so, according to the Amended Complaint, because Ali would lose "substantial" amounts of "time, money, and effort" necessary to submit a bid. *Id.* The Amended Complaint asserts that "if Ali were to win a contract, he may lose the contract after investing resources into performance," and that he "may also be subject to damages, d[e]barment, and even imprisonment." *Id.* ¶ 32.[3]

2.

In October 2020, on motions of the Governor and the Attorney General, the district court ruled that the Amended Complaint had to be dismissed for lack of Article III standing to sue. In concluding that Ali does not possess Article III standing premised on a direct injury, the court's memorandum opinion initially explained that "Ali cannot satisfy [Article III's] injury in fact requirement by pointing to a contract lost for failure to sign a certification, because he has not yet bid on a contract." *See Ali v. Hogan*, No. 1:19-cv-00078, at 9 (D. Md. Oct. 26, 2020), ECF No. 33 (the "Second Dismissal Opinion").[4]

Next, the Second Dismissal Opinion recognized that "Ali's theory of a direct injury rests upon his interpretation of the Executive Order as prohibiting him from even

---

[3] The Amended Complaint contains very few allegations that relate to the relaxed standing requirements for First Amendment cases. Those include that "signing [the Section C] certification would be intimidating" to Ali because of the potential costs of preparing a futile bid or winning and then losing a contract, as well as the possibility of criminal and other penalties. *See* Amended Complaint ¶ 38. The Amended Complaint also alleges that, as a result of the Section C certification requirement, "an individual of ordinary firmness would likely cease boycotting Israel," or at least "cease personal and public support for such a boycott." *Id.* ¶ 39.

[4] The Second Dismissal Opinion is published at 496 F. Supp. 3d 917 (D. Md. 2020).

10

submitting a bid on a contract in the first place." *See* Second Dismissal Opinion 9. The district court readily rejected that theory, however, as being "contrary to the interpretation advanced by the Governor, who has disavowed the applicability of the Executive Order to people like Mr. Ali who choose to boycott Israeli goods and services as a personal matter outside the context of State procurement." *Id.* at 9-10 (internal quotation marks omitted). Although the Second Dismissal Opinion recited that the court was ordinarily bound "to accept as true all allegations in a plaintiff's complaint," the court recognized that it may otherwise be obliged to afford "particular weight" to the Governor's "interpretation of a statute and its rejection of a plaintiff's interpretation as unreasonable." *Id.* at 10 (alterations and internal quotation marks omitted). The court accepted the Governor's construction of the Executive Order as more reasonable than Ali's interpretation, and also for being "consistent with the plain text." *Id.*

On the issue of whether Ali could demonstrate standing to sue premised on a direct injury, the Second Dismissal Opinion summarized that the Amended Complaint "does not allege that [Ali] boycotts Israel in his business capacity" or "that he intends to participate in any activities that would be covered under the Executive Order." *See* Second Dismissal Opinion 11. Accordingly, the district court was unable to "conclude that Mr. Ali is prohibited from bidding on a contract." *Id.* The court thus resolved that "Ali has not

11

sufficiently [alleged] a direct injury that would provide him with standing to challenge the Executive Order." *Id.*[5]

Consequently, pursuant to its Second Dismissal Opinion, the district court resolved to dismiss the Amended Complaint under Federal Rule of Civil Procedure 12(b)(1), for Ali's lack of Article III standing to sue. In its order of that same day, however, the court designated its dismissal as "with prejudice." *See Ali v. Hogan*, No. 1:19-cv-00078 (D. Md. Oct. 26, 2020), ECF No. 34. Ali timely noted this appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

We review de novo a district court's dismissal of a complaint for want of Article III standing to sue — and thus for lack of subject matter jurisdiction — under Federal Rule of Civil Procedure 12(b)(1). *See Pitt Cnty. v. Hotels.com, L.P.*, 553 F.3d 308, 311 (4th Cir. 2009). On appeal, Ali contends that we must only resolve a single narrow issue: whether

---

[5] In its Second Dismissal Opinion, the district court also considered whether the allegations of the Amended Complaint are sufficient to establish standing to sue under the relaxed requirements for First Amendment cases. In ruling that they are not, the court emphasized that the Amended Complaint neither alleges that the Executive Order has caused Ali to engage in self-censorship nor plausibly alleges that the Executive Order is likely to deter a person of ordinary firmness from the exercise of First Amendment rights. *See* Second Dismissal Opinion 16-18. Additionally, the court observed that the Amended Complaint does not sufficiently allege a credible threat of prosecution. *Id.* at 13-16.

he has demonstrated a direct injury that confers Article III standing to sue. As explained below, we agree with the district court that Ali has not made such a showing.[6]

A.

Article III of the Constitution requires a litigant to possess standing to sue in order for a lawsuit to proceed in federal court. *See Benham v. City of Charlotte*, 635 F.3d 129, 134 (4th Cir. 2011) (explaining that "[s]tanding to sue is one aspect of the mandate that an action must present a 'case or controversy' under Article III"). Standing is an "irreducible constitutional minimum" that must be satisfied in all cases. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). In *Lujan*, the Supreme Court outlined three elements that a plaintiff must establish to possess Article III standing: "(1) an injury in fact; (2) a causal connection between the injury and the conduct complained of, such that the injury is fairly traceable to the defendant's actions; and (3) a likelihood that the injury will be redressed by a favorable decision." *Id.* at 560-61 (internal quotation marks omitted). The plaintiff bears the burden of establishing standing to sue as of the time he commenced the litigation. *See Carney v. Adams*, 141 S. Ct. 493, 499 (2020).

Here, the focus is on the first *Lujan* element: whether Ali has suffered an injury in fact. A plaintiff demonstrates an injury in fact when he has "sustained or [is] immediately

---

[6] We are satisfied that Ali has waived any appellate contention that he possesses standing to sue under the relaxed requirements applicable in First Amendment cases. *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief or by failing to develop its argument — even if its brief takes a passing shot at the issue." (alterations and internal quotation marks omitted)). In any event, we are inclined to agree with the district court that the allegations of the Amended Complaint are not sufficient to establish such standing.

13

in danger of sustaining some direct injury as the result of the challenged official conduct." *See City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983) (internal quotation marks omitted). Any imminent danger must be "realistic." *See Peterson v. Nat'l Telcoms. & Info. Admin.*, 478 F.3d 626, 632 (4th Cir. 2007) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). Significantly, the "presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet [Article] III's requirements" for an injury in fact. *See Diamond v. Charles*, 476 U.S. 54, 62 (1986). That is because "[s]tanding is not to be placed in the hands of concerned bystanders," as they may "use it simply as a vehicle for the vindication of value interests." *See Hollingsworth v. Perry*, 570 U.S. 693, 707 (2013) (internal quotation marks omitted).

B.

In determining whether Ali has alleged a direct injury capable of conferring Article III standing to sue, we view the factual allegations of the Amended Complaint in the light most favorable to Ali. *See Cooksey v. Futrell*, 721 F.3d 226, 234 (4th Cir. 2013). We need not, however, accept those allegations "that constitute nothing more than 'legal conclusions' or 'naked assertions.'" *See David v. Alphin*, 704 F.3d 327, 333 (4th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

1.

Ali's primary argument that he has sustained a direct injury is predicated on his own interpretation and understanding of the Executive Order, a construction that prohibits him from bidding due to his personal boycotts of Israel-tied products. *See* Br. of Appellant 13-

14

14 (asserting that Ali "sincerely" and "genuinely" believes he cannot submit a bid).  We cannot agree, however, with Ali's interpretation of the Executive Order.

a.

As the district court recognized, "Section C, which contains the language Mr. Ali would have to sign to submit a bid, does require that bidders affirm that they would not take 'other actions intended to limit commercial relations' with 'a person or entity on the basis of Israeli national origin.'" *See* Second Dismissal Opinion 10-11 (quoting Section C of Executive Order).  But as the court further observed, that language "is limited by [two] 'prefatory clauses' — '[i]n preparing its bid on this project' and 'in the solicitation, selection, or commercial treatment of any subcontractor, vendor, or supplier.'" *Id.* at 11 (quoting Section C).  Accordingly, the court determined that the key passage of Section C should be read as follows:

> *In preparing its bid on this project*, the bidder . . . has not, *in the solicitation, selection, or commercial treatment of any subcontractor, vendor, or supplier*, . . . taken other actions intended to limit commercial relations, with a person or entity on the basis of Israeli national origin.

*Id.*  The court then explained that, read in that manner, the certification required by "Section C is effectively limited to an affirmation that the bidder has not discriminated *in the bid formation process*." *Id.* (emphasis added).

We agree with the district court's well-reasoned distillation of the plain text of the Executive Order, particularly as it relates to Sections B and C.  That is, "Section B prohibits state agencies from contracting with an entity engaging in a boycott of Israel in its business decisions, and Section C requires any bidder to affirm that he or she has not discriminated

15

in the bid formation process." *See* Second Dismissal Opinion 11. In effect, if a business entity has engaged in anti-Israel national origin discrimination in the process of preparing a bid for a state procurement contract, the Executive Order would bar that entity from being awarded the contract. If, by contrast, the entity has engaged in a boycott of Israel entirely unrelated to the bid formation process, the Executive Order is of no moment. By its own terms, the Executive Order's language makes clear that it proscribes anti-Israel national origin discrimination exclusively in the process of a business entity preparing a bid for a state procurement contact.

Critically, the Amended Complaint alleges that Ali boycotts Israel in his personal capacity only, by "refus[ing] to purchase Sabra hummus or SodaStream products, which have ties to Israel and its occupation of Palestine." *See* Amended Complaint ¶ 48. Those limited factual allegations are problematic for Ali, in that the Amended Complaint "does not allege that he boycotts Israel in his business capacity," much less in the context of preparing a bid for a state procurement contract. *See* Second Dismissal Opinion 11. Similar to our decision in *Maryland Shall Issue, Inc. v. Hogan* — where we ruled that the plaintiffs lacked standing — Ali has not alleged "an intent to engage in conduct *arguably* proscribed" by the Executive Order. *See* 963 F.3d 356, 363-64 (4th Cir. 2020).

When pressed in this regard during argument of this appeal, Ali's counsel offered various hypothetical scenarios in which Ali may discriminate — in preparing a bid — based upon Israeli national origin. For example, counsel referred to a scenario where Ali might refuse to work with Hewlett Packard because of that company's ties to Israel. None of those scenarios, however, were alleged in the Amended Complaint. In reviewing a

16

dismissal for want of standing to sue, our examination is generally confined to the factual allegations of the complaint and the exhibits thereto. *See Cooksey*, 721 F.3d at 234. We do not normally rely on assertions of fact made by counsel during oral argument. *Id.*

Given the plain meaning of the Executive Order and the allegations of the Amended Complaint, we are unable to accept the proposition that Ali is prohibited from signing the Section C certification and submitting a bid on a Maryland procurement contract. As such, we reject Ali's related theory that he possesses standing to sue premised on a direct injury.

b.

Although distinguishable, Ali relies on recent district court decisions that involve similar procurement provisions of other states; in them, the courts ruled that plaintiffs sustained direct injuries that conferred Article III standing to sue. The Second Dismissal Opinion assessed and rejected the applicability of the decisions in *Arkansas Times LP v. Waldrip*, 362 F. Supp. 3d 617 (E.D. Ark. 2019), *rev'd on other grounds*, 988 F.3d 453 (8th Cir. 2021), *reh'g en banc granted*, No. 19-1378 (8th Cir. June 10, 2021), and *Jordhal v. Brnovich*, 336 F. Supp. 3d 1016 (D. Ariz. 2018), *vacated as moot*, 789 F. App'x 589 (9th Cir. 2020).

In *Arkansas Times*, a newspaper company refused to sign the State of Arkansas's anti-BDS certification. *See* 362 F. Supp. 3d at 619 ("Act 710 prohibits state entities from entering into contracts with companies for goods or services unless those companies certify in writing that they are not currently engaged in, nor will they engage in for the duration of their contract, a 'boycott of Israel.'"). That certification required companies doing business with state entities in Arkansas to certify that they did not boycott Israel. *Id.* As a

17

result of its refusal to sign the certification, the newspaper lost reoccurring advertising contracts that it had previously maintained with a state university. *Id.* at 620.

Similarly, in *Jordhal*, an attorney — the sole owner of a law firm that, for twelve years, had contracted with a county jail to provide legal services to incarcerated persons — personally participated in boycotts of Israel and wished to have his law firm do the same in its consumer decisions. *See* 336 F. Supp. 3d at 1028-29. Although the lawyer declined to execute the requisite certification, he continued providing legal services to the county jail under a preexisting contract. *Id.* at 1029. After the jail refused to pay the lawyer due to his failure to sign the certification, he filed a lawsuit. *Id.* The district court ruled that he possessed Article III standing to sue because of the direct injury of "not getting paid for services rendered due to [his] refusal to sign the certification." *Id.* at 1033. According to the court, the law firm had "not only experienced a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement," it had "actually sustained injury" by not receiving compensation. *Id.* (internal quotation marks omitted).

In both *Arkansas Times* and *Jordhal*, the plaintiffs "had a long history of contractual dealings with the state" and "had already negotiated a new contract and — but for the imposition of the certification requirement — would have executed it." *See* Second Dismissal Opinion 9. Further, "[a]s a result of their refusal to sign, the plaintiffs . . . either lost a contract that otherwise would have been theirs, or were refused payment on a contract under which they had already rendered performance." *Id.* By contrast, Ali has not submitted a bid for any state procurement contract, much less been offered or accepted one.

18

Ali also maintains that a Texas district court decision, called *Amawi v. Pflugerville Independent School District*, supports his contention that he has sustained a direct injury. *See* 373 F. Supp. 3d 717 (W.D. Tex. 2019), *vacated as moot*, *Amawi v. Paxton*, 956 F.3d 816 (5th Cir. 2020). In *Amawi*, the State of Texas prohibited boycotts of Israel as a condition of public employment. *Id.* at 730. That condition broadly impacted "all actions" taken by a company contracting with the State, regardless of whether the anti-Israel boycotting activity was taken in either a personal or professional capacity. *See* Tex. Gov. Code § 2270.002 (requiring such contractors to certify that they "(1) do not boycott Israel; and (2) will not boycott Israel during the term of the contract"). Ali asserts that, as in *Amawi*, where two of the plaintiffs possessed standing to sue without submitting bids, he has also sustained a direct injury without bidding on a state procurement contract. But Ali's position as to *Amawi* has a crucial infirmity — there, a plaintiff had "already lost income" from having to decline an affirmative offer to work as a paid debate judge, *see* 373 F. Supp. 3d at 733, and another plaintiff was "not paid" for work already performed, *id.* at 734. Logically, because Ali has never submitted a bid for any state procurement contract, he cannot receive an affirmative offer for any such contract, nor can he be compensated for work that he has never performed.

2.

As an additional source of direct injury, Ali argues on appeal that Section C of the Executive Order constitutes an unconstitutionally vague loyalty oath.[7]  Specifically, Ali contends that his situation tracks closely with two of the Supreme Court's so-called oath cases — those resolved in the Court's 1961 decision in *Cramp v. Board of Public Instruction of Orange County*, 368 U.S. 278 (1961), and its 1971 decision in *Connell v. Higginbotham*, 403 U.S. 207 (1971).  We are satisfied, however, that Ali's characterization of the Executive Order as an unconstitutional loyalty oath does not create a direct injury that confers Article III standing to sue.

First and foremost, even if a statute or regulation is allegedly vague or overbroad, that status alone does not establish standing to sue.  As we observed in *Benham v. City of Charlotte*, "[i]t is axiomatic that the Article III standing requirements apply to all actions in the federal courts" and "the fact that the claimant may assert facial vagueness and overbreadth challenges does not alter this aspect of federal jurisprudence."  *See* 635 F.3d 129, 135 (4th Cir. 2011).  Although a facial challenge to a state statute or regulation that is based on the First Amendment may warrant some relaxation of the prudential rule that a

---

[7] Although the district court did not pass on Ali's loyalty oath argument, it was alleged in the Amended Complaint and briefed by the parties in connection with the motions to dismiss.  Ali thereby preserved that argument for appeal.  *See In re Under Seal*, 749 F.3d 276, 287 (4th Cir. 2014) ("To preserve an issue for appeal, an . . . argument must be timely and state the grounds on which it is based."  (alteration and internal quotation marks omitted)).  In these circumstances, we can consider Ali's loyalty oath argument.

claimant may assert only his own right, "the claimant must nevertheless satisfy the injury-in-fact requirement grounded in Article III." *Id.* at 135.

The Supreme Court's 1961 *Cramp* decision is illustrative of when such a relaxation might apply. In *Cramp*, a Florida statute required all state employees to swear that they had never "lent aid, support, advice, counsel or influence to the Communist Party." *See* 368 U.S. at 279. If an employee failed to swear that oath, he would be terminated. *Id.* at 280. In striking down the oath requirement, the Court held that the plaintiff — a public school teacher — had standing to challenge the Florida law. According to the Court, the "extraordinary ambiguity" of the terms "aid, support, advice, counsel, or influence" was such that they were not "susceptible of objective measurement." *Id.* at 286. Although plaintiff Cramp believed that he had never aided, supported, advised, counseled, or influenced the Communist Party, the terms of the required oath were too uncertain for him to execute it truthfully. *Id.* at 284-85. And when faced with possible criminal prosecution for perjury, as the Court explained, "the very vice of which [the plaintiff] complains is that the language of the oath is so vague and indefinite that others could with reason interpret it differently." *Id.* at 284.[8]

---

[8] In the Supreme Court's 1971 *Connell* decision, a modified version of the loyalty oath underlying the *Cramp* case ten years earlier was being contested. *See* 403 U.S. at 208. Florida state employees were required to swear, in relevant part, that they did not "believe in the overthrow of the Government of the United States or of the State of Florida by force or violence." *Id.* The Court struck down that portion of the oath on due process grounds. In his concurrence, Justice Marshall explained why the revised oath was problematic and created an injurious effect — "state action injurious to an individual cannot be justified on account of the nature of the individual's beliefs, whether he 'believe(s) in the overthrow' or has any other sort of belief." *Id.* at 209.

21

In this situation, by comparison, one need not guess about the meaning of Governor Hogan's Executive Order. The Section C certification that must be signed in order to submit a bid to the State addresses those "actions" actually taken during the bid's preparation, not beliefs or political ideology. *See* Second Dismissal Opinion 11. That is, the Executive Order requires a business entity to refrain from discriminating on the basis of Israeli national origin only in forming a bid. It does not require the entity to, for example, pledge any loyalty to Israel or profess any other beliefs. We are therefore unable to identify any reason to cast the Section C certification as an unconstitutionally vague loyalty oath.

C.

Finally, although we are satisfied that Ali has not alleged facts adequate to establish Article III standing to sue, we recognize that the dismissal of his Amended Complaint should be without prejudice. As we have heretofore observed, "[a] dismissal for lack of standing — or any other defect in subject matter jurisdiction — must be one without prejudice, because a court that lacks jurisdiction has no power to adjudicate and dispose of a claim on the merits." *See S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 185 (4th Cir. 2013) (citing Fed. R. Civ. P. 41(b)). In these circumstances, we hereby modify the judgment on appeal and rule that it is a dismissal "without prejudice." *See Buscemi v. Bell*, 964 F.3d 252, 261 (4th Cir. 2020).[9]

_____

[9] On appeal — as they did in the district court — Governor Hogan and Attorney General Frosh raised Eleventh Amendment immunity as an alternative ground for dismissal of the Amended Complaint under Rule 12(b)(1). Because the district court concluded that Ali did not possess Article III standing to sue, however, it did not resolve the immunity issue. We also refrain from addressing the Eleventh Amendment contention.

## III.

Pursuant to the foregoing, we affirm the district court's judgment dismissing the Amended Complaint, but modify that ruling to render it a dismissal without prejudice.

*AFFIRMED AS MODIFIED*